CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND, Sweetheart Cup Company, Inc., and Iron Workers Tri–State Welfare Fund, Movants–Appellants,

Linda J. Cahn, Esq., Movant–Appellant,

Group Hospitalization and Medical Services, Doing Business as CareFirst Blue Cross Blue Shield, Movant–Appellant,

v.

MERCK–MEDCO MANAGED CARE, L.L.C. a/k/a Medco Health Solutions, Inc., Defendant–Counter–Claimant–Appellee,

Frank Steve McMillan, David J. Gibson, Adam Miles, Monica Keim, on Behalf of Northwest Airlines Prescription Plan and all other Similarly Situated Plans, Pamela Stolz, on Behalf of

Northwest Airlines Prescription Plan and all other Similarly Situated Plans, Rosemarie DeLong, Carl J. Goodman, Trustees of the United Food & Commercial Workers, Gary Pietrzak, on Behalf of the Minnesota Teamsters Health and Welfare Plan, and Peabody Energy Corporation, Consolidated Plaintiffs,

Betty Jo Jones, Intervenor Plaintiff,

Genia Gruer, on Behalf of Herself and all others Similarly Situated, Walter J. Green, on Behalf of Himself and all others Similarly Situated, Mildred Bellow, on Behalf of Herself and all others Similarly Situated, Elizabeth O'Hare, on Behalf of Herself and all others Similarly Situated, Employers Health and Welfare Plan and Trust and Margaret J. Weener, Plaintiffs–Appellees,

Marissa Janazzo, as Fiduciary for the County Line Buick Nissan Employee Welfare Benefit Plan, on Behalf of Herself as a Fiduciary and all other Similarly Situated Fiduciaries of Employee Welfare Benefit Plans, Plaintiffs–Counter–Defendants–Appellees,

Harry J. Blumenthal, Jr. and Alan Horwitz, as Fiduciaries for the Blumenthal Print Works, Inc. Welfare Benefit Plan, on Behalf of Themselves as Fiduciaries and all other Similarly Situated Welfare Benefit Plans, Plaintiffs.

Docket Nos. 04–3300–CV(L), 04–3464–CV(CON), 04–3545–CV(CON) and 04–3871–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: May 18, 2005.

Decided: Dec. 8, 2005.

Kenneth P. Ross, Robert F. Coleman & Associates, Chicago, IL (Robert F. Coleman, Sean B. Crotty, Robert F. Coleman & Associates, Chicago, IL; Eugene I. Pavalon, Pavalon, Gifford, Laatsch & Merino, Chicago, IL), for Movants–Appellants Central States Southeast and Southwest Areas Health and Welfare Fund, Sweetheart Cup Company, Inc., and Iron Workers Tri–State Welfare Fund.

W. Scott Simmer, Robins, Kaplan, Miller & Ciresi LLP, Washington, D.C. (Robert A. Scher, Foley & Lardner L.L.P., New York, NY; Christopher P. Sullivan, Robins, Kaplan, Miller & Ciresi LLP, Washington, D.C.), for Movants–Appellants Group Hospitalization and Medical Services d/b/a CareFirst Blue Cross Blue Shield.

Linda J. Cahn, Law Office of Linda J. Cahn, Esq., Morristown, NJ, Movant–Appellant.

Arthur N. Abbey, Abbey Gardy, LLP, New York, N.Y. (Karin E. Fisch, Abbey Gardy, LLP, New York, NY), for Plaintiffs–Appellees Elizabeth O'Hare, Genia Gruer, Estate of Mildred Bellow, Walter J. Green, and Marissa Janazzo.

Philippe Z. Selendy, Boies, Schiller & Flexner, LLP, New York, N.Y. (David Boies, Edward Normand, Boies, Schiller & Flexner, LLP, Armonk, NY), for Plaintiffs–Appellees Elizabeth O'Hare, Genia Gruer, Estate of Mildred Bellow, Walter J. Green, and Marissa Janazzo.

Before: MINER and POOLER, Circuit Judges, and BLOCK, Judge.*

MINER, Circuit Judge:

This appeal involves challenges to the District Court's approval of an amended settlement agreement ("Settlement Agreement") arising out of the commencement of class action suits brought against a pharmaceutical benefits manager ("PBM"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq. The Settlement Agreement would affect more than 815,000 employee health benefit plans, which provide or provided prescription benefit coverage to approximately fifty-one million Americans. Movant-appellant Group Hospitalization and Medical Services, doing business as CareFirst Blue Cross Blue Shield ("CareFirst"), appeals from a Judgment of the United States District Court for the Southern District of New York (Brieant, J.), entered June 30, 2004, incorporating an Order, entered March 25, 2004, of that same court, denying CareFirst's motion to intervene in the class action litigation, the District Court having determined that CareFirst is not a mem-

---

* The Honorable Frederic Block, Senior District Judge for the Eastern District of New York, sitting by designation.

ber of the class and therefore lacks standing and authority to object to the settlement agreement on its own behalf or to opt out of the Settlement Agreement. Movants-appellants, CareFirst, Central States Southeast and Southwest Areas Health and Welfare Fund ("Central States"), Sweetheart Cup Company, Inc. ("Sweetheart"), Iron Workers Tri–State Welfare Fund ("Iron Workers"), and Linda J. Cahn, Esq. ("Cahn")[1] (collectively, the "Movants–Appellants"), all appeal from the same Judgment of the District Court, entered June 30, 2004, incorporating orders (i) certifying the instant action as a class action, pursuant to Fed.R.Civ.P. 23(a) and (b)(3); (ii) approving the amended Settlement Agreement, dated July 31, 2003; (iii) awarding legal fees and disbursements; and (iv) severing cases in which the ERISA plans opted out of the settlement.

On this appeal, Movants–Appellants raise the following issues: (i) whether individual ERISA plan participants and beneficiaries who suffered neither economic nor medical injuries as a result of the PBM's actions had standing under Article III of the United States Constitution to assert claims that the PBM violated its fiduciary obligations to the ERISA plans to which they belonged; and (ii) whether a named ERISA plan trustee had Article III standing to assert the same. Assuming either of the preceding questions is answered in the affirmative, Movants–Appellants present the following additional issues: (i)

whether the adverse interests of the self-funded plans and insured or capitated plans created a conflict of interest requiring the court to create subclasses before approving the Settlement Agreement;[2] (ii) whether the District Court abused its discretion in certifying the class and approving the Settlement Agreement; (iii) whether the District Court abused its discretion in denying a motion to intervene made by an entity that (a) acted as an insurer for certain plans and (b) acted as a third-party administrator for other plans; and (iv) whether the District Court abused its discretion in setting the amount of the attorney's fee for the attorney of an ERISA plan trustee who opted out of the class.

Serious questions have been raised as to whether four of the class action representative plaintiffs—plan participants and beneficiaries who apparently suffered neither economic nor medical injuries resulting from the PBM's alleged wrongdoings—have Article III standing to assert, on behalf of their Plans, claims that the PBM violated its fiduciary obligations under ERISA and, thus, whether they had the authority to enter into the Settlement Agreement with the PBM on behalf of the class. There is also a serious question as to whether one of the representative plaintiffs, a plan trustee and fiduciary who allegedly had a contract with the PBM, or with an insurer who in turn had coverage with the PBM, is able to demonstrate the requisite injury-in-fact to support Article III standing. The failure of the District

---

1. By order of this Court entered on February 17, 2005, all portions of the brief of Linda Cahn except those related to her own claim for attorneys fees were stricken. Accordingly, only those arguments put forward by the remaining Movants–Appellants are considered in this Opinion as to the other issues.

2. Insured plans pay set premiums to an insurance company in exchange for full payment of their members' prescription drugs. Capitated plans pay set amounts to a PBM in exchange for full payment of their members' prescription drugs. The insurer or the PBM carry all the risk of claims for prescription drug costs. Self-funded plans, however, pay a PBM an administrative fee, but no premium, and retain for themselves the obligation of paying for the prescription drugs provided to their beneficiaries and participants.

Court to resolve these questions compels us to vacate the Judgment of the District Court and to remand for a decision on the jurisdictional issue of Article III standing.

## BACKGROUND

### I. *Litigation History*

On December 12, 1997, a complaint was filed in the United States District Court for the Southern District of New York against the PBM defendant-counter-claimant-appellee Merck–Medco Managed Care, L.L.C., Merck & Co., Inc., and Medco Health Solutions ("Medco").[3] *Gruer v. Merck–Medco Managed Care, L.L.C.*, Civil Action No. 9167(CLB) (Dec. 12, 1997). The Complaint asserted breaches of Medco's alleged fiduciary duties to pharmaceutical benefit plans ("Plans") that it contracted with, in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. Between 1997 and 2002, five more putative class action cases were filed against Merck and Co., Inc. (Medco's parent company at the time) in the Southern District of New York. All these cases were consolidated into the present action. In 2001, the Judicial Panel on Multidistrict Litigation accepted jurisdiction of these and other cases and consolidated them in the Southern

District.[4] Each action was brought as a putative class action and each arose out of Medco's alleged breach of fiduciary duties owed to employee benefit plans under ERISA. Each class action was brought on behalf of all fiduciaries, participants, and beneficiaries of all employee welfare benefit Plans with prescription benefit coverage that (i) had contracts with Medco or any subsidiary of Merck; (ii) received prescription benefit services from Medco during the class period; and (iii) used a certain Medco formulary on an "open" formulary basis.[5]

The named plaintiffs in four of the six class action cases, Genia Gruer, Walter Green, Mildred Bellow, and Elizabeth O'Hare (collectively, the "Individual Plaintiffs"), were individual Plan beneficiaries suing under ERISA to obtain derivative relief for each of their own Plans and their members and all other Plans in the country that received Medco prescription benefit coverage. The Individual Plaintiffs sought to represent a putative class of all Plans that contracted directly with Medco, and all Plans that had contracted with insurers that had in turn contracted with Medco—i.e., more than 815,000 Plans.

A fifth named plaintiff, Marissa Janazzo ("Janazzo") was a Plan trustee purporting to sue on behalf of her Plan and all simi-

---

3. Medco was and is one of the largest pharmaceutical benefit management companies in the United States. In providing prescription benefit coverage to more than fifty-one-million individuals, Medco contracts with approximately 2000 entities such as private corporations, unions, HMOs, insurance companies, and government entities that provide prescription benefit coverage for the individual beneficiaries. These entities, in turn, contract with employee benefit plans, resulting in prescription benefit coverage to more than 815,000 Plans. *See generally* Medco Home Page, http://www.medc o.com (last visited Dec. 7, 2005).

4. To date, twelve additional actions against Medco have been transferred to the Southern District, all containing the same or similar allegations of breaches of fiduciary duties owed to employee benefit plans under ERISA.

5. A formulary is a list of favored and preferred prescription drugs in each therapeutic category. Medco distributes its own standardized formulary—the Preferred Prescriptions Formulary—to doctors, retail pharmacists, and plan members to encourage them to increase their use of formulary drugs and to decrease their use of non-formulary drugs. Not all Plans use Medco's standardized formulary. Some Plans use their own customized formulary.

larly situated Plan trustees whose Plans received prescription benefit coverage from Medco. Janazzo and the four Individual Plaintiffs are collectively referred to in this opinion as the "Plaintiffs."[6] Janazzo's complaint, and two later amended complaints, alleged that her Plan received prescription benefit coverage either through a contract with Medco or through a contract with an insurer that in turn had coverage with Medco.

The named plaintiffs in the sixth case, Harry J. Blumenthal, Jr. and Alan Horwitz ("Blumenthal" or the "Blumenthal Plan"), were Plan trustees suing on behalf of their Plan and all other Plan trustees in similarly situated circumstances. Blumenthal's complaint was crafted to represent only about 2,000 Plans; to wit, those which contracted directly with Medco. Blumenthal proffered to the District Court his Plan contract, which reflected that the Blumenthal Plan contracted to use Medco's standardized formulary, to participate in Medco's drug-switching programs, and to be paid rebates. The Blumenthal Plan objected to the class certification and Settlement Agreement, electing eventually to opt-out of the class. Blumenthal was a member of the preliminarily certified class and a named plaintiff at the time that the District Court preliminarily approved the Plaintiffs' motion for class certification on July 31, 2003, and also at the time when the Notice of Pendency of Class Action, Proposed Class Settlement and Hearing (the "Class Notice") was issued on September 16, 2003. The Class Notice stated, however, that "[i]t is anticipated that the [p]laintiff Plan in the Blumenthal action will either exclude itself from or object to the Settlement [Agreement]." The Blu-

menthal Plan remained a named plaintiff, according to the District Court, "[b]ecause there was uncertainty as to whether Blumenthal would opt out of the Settlement as the [P]lan ultimately did, or remain within the Class and file objections to the Settlement."

The Plaintiffs claimed that Medco held itself out as an independent PBM that could control the quickly rising costs of prescription drugs by aggregating the purchasing power of employee benefit plans and thereby negotiating favorable purchasing terms with drug manufacturers. In reliance on Medco's promises of cost containment, Plan sponsors entrusted Medco with discretionary authority over certain aspects of the management of their pharmacy benefit Plans for the primary purpose of cost containment. The Plaintiffs claimed that Medco "systematically misused its fiduciary authority, and its management of formularies and drug-switching programs, among other purposes, (i) to increase the market share in specific drugs of its parent company Merck, and (ii) to divert rebates from drug manufacturers to itself, both at the expense of the Plans." The Plaintiffs contended that Medco did not disclose the nature of its plan-management practices or the extent to which the Plans failed to obtain benefits, or incurred costs, because of such practices. The Plaintiffs further alleged that Medco and its parent company Merck ("Merck") engaged in transactions prohibited under ERISA. The Plaintiffs alleged that Medco had:

> (i) managed standardized formularies in a way that favored Merck products over competing drugs, including through the

---

**6.** The law firm of Abbey Gardy ("Gardy") represented the plaintiff class representatives, Genia Gruer, Walter Green, Mildred Bellow, Elizabeth O'Hare, and Marissa Janazzo (collectively, the "Plaintiffs"), in each of the five cases at the outset. In late 2000 and early 2001, several of the Plaintiffs retained the law firm of Boies, Schiller & Flexner ("Boies Firm"). The two firms coordinated their efforts on behalf of the class thereafter.

designation of Merck products as "preferred," the use of relative-cost indicators to favor Merck products, and the exclusion from its formularies of certain drugs that competed with Merck products; (ii) implemented drug-interchange programs in a way that tended to increase the sales of Merck drugs, including through encouraging switches from prescriptions for relatively lower-cost competing drugs to prescriptions for relatively higher-cost Merck drugs; (iii) entered into drug-purchase contracts with pharmaceutical manufacturers, including Merck, that included price, rebate, discount, and other terms that were not advantageous to the interests of the [P]lans but instead tended to favor the interests of Merck and of Medco itself (or, similarly, refused to enter into contracts that would have reduced costs for the [P]lans but increased competition for Merck); (iv) engaged in transactions with Merck that are prohibited under ERISA, including the effective transfer of [P]lan assets to Merck through drug-purchase contracts with Merck negotiated by Medco on behalf of the plans; and (v) generally failed to disclose to the [P]lans that it was not acting exclusively in the interests of the [P]lans but instead was acting in its own interests and those of its parent company Merck.

Pls.-Appellees' Br. in Opp'n to Central States et al. 5–6.

Medco filed for summary judgment on September 21, 1999; however, the motion was deferred pending discovery and later withdrawn because of settlement discussions. In December 1999, the first four actions, consolidated under 97–Civ–9167, were referred on consent to Special Master Charles G. Moerdler, to aid in, among other things, discovery issues and disputes. The parties began intensive settlement negotiations in summer 2001, under the direct supervision of the Special Master and with some participation of the District Court. These negotiations ultimately resulted in the Settlement Agreement.

## II. *Settlement Agreement*

The at-issue class, as defined by the parties' Settlement Agreement, consisted of all employee welfare benefit Plans that have, or have had, contracts with Medco, whether directly or indirectly (including through third party administrators, HMOs, insurance companies, Blue Cross Blue Shield entities, or other intermediaries (collectively, "TPAs")), where the contracts between such plans and Medco were both (a) in force at any time between December 17, 1994, and the date of the final approval of the settlement contemplated by the Settlement Agreement, and (b) subject to ERISA.

Under the terms of the Settlement Agreement, Medco agreed to modify its business practices to include significant disclosures as to the bases of changes in the formularies and drug interchange programs managed by Medco, and to pay $42.5 million into a settlement fund to be paid to class members. Attorneys' fees, not to exceed 30%, and expenses are also to come from the settlement fund of $42.5 million. In exchange, Plaintiffs are required under the terms of the Settlement Agreement to release all claims of the class to the extent that the claims arise under ERISA or arise from, or relate in any way to, the transactions or occurrences that were the subject of the actions asserted against Merck or Medco by the Plaintiffs; Plaintiffs are furthermore obligated to release claims against third-party administrators ("TPAs") and plan sponsors that have contracted with such TPAs that were based upon, arose from, or related to the conduct of Medco or Merck. The Settlement Agreement, however, does not re-

lease anti-trust claims or contract claims not affected by ERISA.

The settlement fund allocates to the settling Plans within the certified class an amount based primarily on the amount of each settling Plan's proportionate share of the total drug spend of all settling Plans for the class period. According to the terms of the Settlement Agreement, if a Plan pays for prescription-drug benefits on an insured or capitated basis, or if the Plan otherwise does not participate in any Medco brand-to-brand therapeutic-interchange program, the Plan's proportionate share of the total drug spend is reduced by 55%. "The reduction reflects the fact that ... because the alleged injuries of capitated plans flow through changes over time in insurance premiums, the capitated [or insured] plans would not have been damaged directly by the conduct that Class counsel alleged [to have caused] increased costs to plans, and are much more likely to have been injured by certain of the conduct (affecting large-dollar rebates) than other conduct (affecting smaller negative interchange amounts)." Pls.-Appellees' Br. in Opp'n to Central States et al. 10.

The District Court preliminarily granted the Plaintiffs' motion for class certification and approval of the amended Settlement Agreement on July 31, 2003. On September 16, 2003, the Class Notice was issued. The Class Notice was sent out to over 815,000 class members to inform them of the proposed Settlement Agreement. Class members seeking to opt-out of the class and the Settlement Agreement were instructed to do so by mail by November 14, 2003. Class members were also informed of the "fairness hearing" to be held on December 11, 2003, to determine the fairness, reasonableness, and adequacy of the Settlement Agreement. On the first day of the fairness hearing on December 11, 2003, the District Court received and heard a number of objections to the Settlement Agreement, some of which were withdrawn. At the initial fairness hearing, it was also discovered that numerous TPAs and other intermediaries did not forward the Class Notice to the Plans on whose behalf they contracted with Medco. The District Court, by order of March 15, 2004, ordered a supplemental class notice to be sent to the class members that had not received the original Class Notice. The fairness hearing, for class members that had not received adequate notice, resumed on May 6, 2004, at which time the applications were fully submitted for decision.

During the May 6, 2004, hearing, Plaintiffs' class counsel informed the District Court that no additional objections had been filed in response to the supplemental notice sent, and only three of the objections heard at the initial hearing remained. At that time, there were approximately 200 individual Plans that had opted out of the settlement. Thirteen out of the seventeen cases involved in the litigation were set to be closed upon approval of the Settlement Agreement by the District Court.

III. *Objections to the Proposed Settlement Agreement*

Sweetheart is a Plan sponsor of an employee welfare benefit plan located in Owings Mills, Maryland. Sweetheart entered into a contract titled "Integrated Prescription Drug Program Agreement" with Systemed, L.L.C. ("Systemed"), an affiliate of Medco. In the agreement, Systemed agreed to provide Sweetheart with a prescription drug benefit program and to be its PBM. Sweetheart is a member of the class as defined by the Settlement Agreement. As a sponsor of a Plan through Systemed, the contract was subject to ERISA. Sweetheart is a self-funded Plan that asserted its interests were not pro-

tected by the settling Plaintiffs, who represented insured and capitated Plans.

Iron Workers is an employee benefit fund located in Lansing, Illinois. Iron Workers also contracted with Systemed. Iron Workers is a member of the class in the same way Sweetheart is and also objected to the Settlement Agreement on the same grounds that Sweetheart did.

Central States is an employee welfare benefit fund in Rosemont, Illinois. Central States is also a member of the class in the same way Sweetheart and Iron Workers are members. Central States contracted with Medco to provide Central States with managed prescription-drug program services and to act as its pharmaceutical manager. Central States also objected to the Settlement Agreement on the same grounds as both Sweetheart and Iron Workers.

Central States, Iron Workers, and Sweetheart (collectively, the "Self–Funded Plans") each objected to the Settlement Agreement and to the certification of the class, and sought leave to intervene in the class action to represent all of the self-funded Plans, which the Self–Funded Plans argued should be a certified subclass. The Self–Funded Plans claimed that the allocation between the self-funded drug Plans and the insured or capitated drug plans was unfair, inadequate, and unreasonable. The Self–Funded Plans claimed that the Settlement Agreement unfairly favors the insured and capitated, as opposed to the self-funded, Plans. They argued that Plans that paid for insurance to avoid the risk of paying claims would share in the settlement fund, albeit at a reduced rate, notwithstanding that they suffered no damages. The Class Notice is not clear as to how the proponents of the settlement arrived at the insured plans' reduction of claims to 55% relative to the claims of the self-funded Plans.

The Self–Funded Plans contended that no subclass adequately represented their interests. The Self–Funded Plans also asserted that there is a conflict of interest in the representation of the class, arguing that only a self-insured Plan or sponsor can adequately represent their interests.

Based upon the fairness hearing and class counsels' memoranda of law in support of Plaintiffs' motion for final approval of settlement, the District Court resolved the conflict as follows:

> [I]n practical reality no such conflict of interest exists. The same legal theory underlies all [c]lass [m]embers' claims, that Medco violated ERISA in exercising its discretionary authority to negotiate with drug manufacturers on behalf of its [P]lan sponsors, and in its control over the formularies and therapeutic drug interchange program. Although the negative drug interchange claim directly affected the self-funded plans as opposed to the insured [P]lans, this is insufficient to find a conflict of interest exists. Class [c]ounsel determined that Medco's failure to pass through rebates may have increased or failed to reduce the drug-acquisition costs of the members of the insured [P]lans in addition to those of the self-funded [P]lans. Accordingly, the 55% reduction applying to the insured [P]lans was determined to be a reasonable discount of their claims. "Even where there are some individualized damages issues," common issues may predominate "when liability can be determined on a class-wide basis." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139 (2d Cir.2001).

*In re: Medco Health Solutions, Inc., Pharmacy Benefits Management Litigation,* No. 03 MDL 1508(CLB), 2004 U.S. Dist. LEXIS 28606, at \*13–14, 2004 WL 1243873, at \*4 (S.D.N.Y. May 25, 2004).

The Self–Funded Plans also claimed that the Settlement Agreement inadequately described the distribution of the settlement funds. They contended that class members cannot calculate their proportionate share based on the information in the proposed Settlement Agreement or the Notice. The Settlement Agreement and Class Notice state that allocation of the funds "shall be made primarily on the basis of each settling Plan's proportionate share of the total drug spend of all settling Plans." *In re: Medco Health Solutions,* 2004 U.S. Dist. LEXIS 28606, at *14, 2004 WL 1243873, at *4. The District Court noted that the Self–Funded Plans claimed that this wording does not (i) explain the meaning of "primarily"; (ii) disclose the non-primary bases for determining allocation and methodology; (iii) or indicate the total drug spend of the proposed class during the class period. The Self–Funded Plans also contended that there is no basis to determine whether the $42.5 million cash component is reasonable. The District Court rejected these contentions.

Finally, the Self–Funded Plans argue that the Class Notice and paragraph seventeen of the Settlement Agreement are unfairly misleading as to which claims are retained by the class members. Paragraph seventeen of the Settlement Agreement states:

> Nothing in paragraph [sixteen] is intended to release or to be construed to release Medco from contract claims asserted by parties with which Medco has contracted to provide services, including (where permitted by applicable state law) contract claims for breach of implied covenant of good faith and fair dealing, provided, however, that claims not based on contract are released to the extent provided for in paragraph [sixteen]. Nothing in paragraph [sixteen] is intended to release or to be construed to release TPAs from contract claims asserted by parties with which any TPA has contracted to provide services, including (where permitted by applicable state law) contact claims for breach of the implied covenant of good faith and fair dealing, provided, however, that claims not based on contract are released as provided for in paragraph [sixteen].

*In re: Medco Health Solutions,* 2004 U.S. Dist. LEXIS 28606, at *14, 2004 WL 1243873, at *4. Rejecting this argument, the District Court reasoned as follows: "The Amended Settlement Agreement is clear and it speaks for itself. Further, it was admitted by Medco during the December 11, 2003, conference that 'the contract claims are carved out and not released. Medco agrees with settling counsel that none of the contract claims will be released for any of Medco's clients and no contract claims are preempted by ERISA.'" *In re: Medco Health Solutions,* 2004 U.S. Dist. LEXIS 28606, at *15–16, 2004 WL 1243873, at *5. The District Court determined that all the objections made by the Self–Funded Plans were without merit and, as such, overruled them.

IV. *Motion to Intervene Brought by CareFirst*

On November 14, 2003, movant-appellant CareFirst, a TPA that provides insurance and administrative services to insured and self-funded plans governed by ERISA, filed an amicus brief opposing certification of the settling class. On February 13, 2004, CareFirst also filed a motion to intervene in order (i) to argue that the opt-out provisions of the class notice should include the right of a health benefit payor to opt-out of the settlement class, and (ii) to challenge certification of the settlement class in the event that its opt-out was deemed ineffective. CareFirst also filed an opt-out form on November 12, 2003,

seeking to exclude itself from the class action settlement both as the insurer of its insured ERISA plan customers and on behalf of its self-funded ERISA plan customers.

CareFirst is an independent licensee of the Blue Cross Blue Shield Association and provides health care and related services to over three-million members in Maryland, Virginia, Delaware, and the District of Columbia. CareFirst outsourced management of its retail pharmacy prescription benefit drug program to Medco, as its PBM.[7] CareFirst entered into a series of agreements with Medco providing for various PBM services in order to obtain negotiated-for competitive reimbursement rates for pharmacy services. As a result of these agreements, CareFirst entrusted Medco with management of its drug plans and granted Medco authority and/or control over the management or disposition of its drug program. In turn, Medco was to negotiate discounts with retail pharmacies and collect rebates from drug manufacturers—two tasks that Medco claimed to have expertise in.

Through its own investigative efforts, CareFirst allegedly discovered that Medco had allegedly breached its contractual duties owed to CareFirst by "failing to pass through rebates garnered from pharmaceutical manufacturers for favoring their drugs, switching from less expensive equivalent drugs to more expensive drugs (many of them manufactured by Medco's former parent, Merck), and by 'skimming' the spread between what it paid pharmacies and what it charged CareFirst." Movants–Appellants' Br. for CareFirst 5.

CareFirst serves both as (i) an insurer of ERISA insured plans—which means that it assumes "all claims risk and the associated rights and obligations for payment to health care providers such as Medco, including the right to pursue any overcharges and fraudulent payments against Medco," in exchange for receiving a premium—and (ii) a TPA to ERISA self-funded plans—which means that it "contract[s] to pay claims to health care providers like Medco on behalf of its self-funded customer plans, including being charged with seeking recovery of the overcharges and fraudulent charges such as those against Medco" in exchange for an administrative fee. Movants–Appellants' Br. for CareFirst 4–5. TPAs carry out the various day-to-day administrative duties of a plan, including, for example, handling sensitive employee medical claims and claims for prescription drugs. As a TPA, CareFirst claimed that it "is bound by contract and course of dealing to act on behalf of its self-funded plan customers to pursue overpayment of benefits," and that "[i]nsurers and TPAs were specifically carved from the class, yet the plans they insured and administered were included [in the class]." CareFirst argued that its claims against Medco, some of which are being litigated in another action in New Jersey, *Group Hospitalization and Medical Services, d/b/a CareFirst Blue Cross Blue Shield v. Merck–Medco Managed Care, L.L.P., et al.*, No. CAM–L–4144–03 (N.J.Sup.Ct.2003), could be improperly released by the at-issue Settlement Agreement should CareFirst be denied an opportunity to opt-out the claims

---

7. PBMs, such as Medco, are attractive to health benefit payors like CareFirst because PBMs offer a number of cost-management initiatives, including "(1) programs to reduce reimbursement rates for drugs dispensed to members (e.g., negotiated discounts and mail service pharmacies); and (2) programs designed to manage utilization and decrease costs (e.g., drug utilization review programs, formularies, negotiated rebates from drug manufacturers, generic substitution programs, and/or therapeutic substitution programs)." Movants–Appellants' Br. for CareFirst 3.

of its insured and self-funded Plans in the certified class.

The District Court denied CareFirst's motion to intervene by Memorandum and Order on March 25, 2004, *In re: Medco Health Solutions, Inc., Pharmacy Benefits Management Litigation,* No. MDL–1508 (S.D.N.Y. Mar. 25, 2004), concluding that the right to accept or reject the proposed settlement belonged to the Plan fiduciaries and not to TPAs such as CareFirst. The District Court reasoned that "[b]ecause CareFirst is not a member of the class, and its rights will not be affected by the approval of the Settlement, CareFirst lacks standing to object on its own behalf and has failed to demonstrate that it has authority to act for a[P]lan in opting out." The District Court, explaining CareFirst's argument, stated that:

> CareFirst claims . . . that it is a Third Party Administrator (TPA) that administers insured and self-insured Plans pursuant to contract with the Plan sponsors or fiduciaries. CareFirst seeks to modify the provisions in the proposed settlement agreement relating to Opting–Out, so as to allow it and similarly situated TPAs "to Opt–Out the claims of their insured and self-insured Plans."

*Id.* at 1–2. The District Court noted that the Class Notice and proposed class Settlement Agreement were both crafted over a "long period of time by highly skilled lawyers and others representing the various interests involved." The District Court concluded, in regard to the TPAs, that:

> There are no unreasonable restrictions on the Opt–Out rights. The TPAs, by their own concession, are at most nothing more than administrators and in some cases insurers. The fiduciary duty

is vested in the Plan sponsor or the designated fiduciary named in any particular plan, and such statutory duty may not be evaded by delegation to an administrator. If anybody's rights were violated by the Defendant, it was the rights of the Plan not the administrator with whom the Plan fiduciaries contracted.

*Id.* at 3. The District Court denied CareFirst's motion to intervene, explaining that "[t]he right to accept or reject the proposed settlement belongs to the Plan Fiduciaries not to the TPAs."[8] *Id.* at 5. Notably, in regard to CareFirst's concerns that it could have some of its claims in its New Jersey action released as a result of the Settlement Agreement, the District Court carefully pointed out that the Settlement Agreement did not release any contract or other direct claims that TPAs may assert against Medco and that if a TPA believed that any Plan was obligated to opt out, that TPA was free to make such a demand upon the Plan.

## V. *District Court Order of May 25, 2004, Certifying the Class and Approving the Settlement Agreement*

As noted above, the District Court granted preliminary approval to the class certification and the Settlement Agreement on July 31, 2003. By Memorandum and Order of the District Court, dated May 25, 2004, the District Court certified the instant action as a class action, pursuant to Fed.R.Civ.P. 23(a) and (b)(3), and approved the Settlement Agreement, dated July 31, 2003, determining that it "is within the range of fair, reasonable, and adequate settlement of the claims of the Class." The District Court also awarded legal fees and disbursements and held that

---

8. The Settlement Agreement explains that "TPAs are excluded from the definition of the class, except that, to the extent a given TPA is a plan sponsor with respect to an employee benefit plan, the TPA shall be a member of the class solely in such capacity."

"[t]hose consolidated cases in which the Plans have opted out of the settlement are hereby severed."

## VI. Attorneys' Fees and Disbursements for Class Counsel

Under paragraph twelve of the Settlement Agreement, attorneys' fees, not to exceed 30%, and expenses are to be paid out of the Settlement Fund. The settling Plaintiffs' counsel, Abbey Gardy, LLP and Boies, Schiller & Flexner, LLP, requested that the District Court approve their application for attorneys' fees in the amount of $12.75 million, 30% of the settlement fund, a 1.79 multiple of their lodestar, and for disbursements in the amount of $893,294.50. From their fee award, settling Plaintiffs' counsel agreed to absorb payment of a reasonable fee to Lowey, Dannenberg, Bemporad, & Selinger, and Rawlings & Associates (collectively the "Lowey Firm"), which had requested a fee award in the amount of $637,500, a 1.317 multiplier of their lodestar of $483,947.50, and disbursements in the amount of $19,576.96. The District Court, approving class Plaintiffs' application for attorneys' fees, held that

... the present fee application for 30% of the [s]ettlement [f]und made by Abbey Gardy and Boies, Schiller & Flexner and including the services of the Lowey firm is reasonable. It is clear by [s]ettling Plaintiffs' submissions that [c]ounsel expended a substantial amount of time and effort in this litigation. The total combined lodestar for [s]ettling Plaintiffs' [c]ounsel and the Lowey firm is $7,138,047.25, representing almost 16,000 hours spent litigating this case. Settlement negotiations began almost three years ago, and were completed only by the tremendous effort of counsel.

The litigation occurred over a period of six years, and was performed on a purely contingent basis, with [c]lass [c]ounsel advancing the many thousands of dollars of necessary disbursements. If, after trial, [c]lass Plaintiffs were unsuccessful, due to the contingent nature of the lawsuit, [s]ettling Plaintiffs' [c]ounsel would have received no compensation. [C]ontingency risk and quality of representation must be considered in setting a reasonable fee.

Settling Plaintiffs' [c]ounsels' request of 30% of the [s]ettlement [f]und, applies a multiplier of 1.786 to the submitted lodestar. This multiplier is reasonable and fair . . . .

The [c]ourt awards [s]ettling Plaintiffs' [c]ounsel (including the Lowey Firm) a fee award of 30% of the [s]ettlement [f]und, calculated as $12.75 million, less the award of legal fees to Linda J. Cahn . . . , and disbursements in the amount of $893,294.50 for [s]ettling Plaintiffs' [c]ounsel and disbursements for the Lowey firm in the amount of $19,576.96. Under the class notice, total fees may not exceed 30%.

*In re: Medco Health Solutions,* 2004 U.S. Dist. LEXIS 28606, at *34–35, 2004 WL 1243873, at *11.

## VII. Fee Application of Linda J. Cahn, Esq.

By motion filed December 10, 2003, and supplemented on March 9, 2004, attorney Linda J. Cahn ("Cahn"),[9] who represents

---

**9.** The District Court discussed some of Cahn's background and connection to this case:

[I]t is undisputed that Ms. Cahn originated the theory of ERISA liability upon which the complaints in these cases [were] founded. She tells us that she proposed the idea of bringing the cases for the first time during employment interviews at the firm of Abbey Gardy & Squitieri LLP (the "Abbey" firm) and she joined the Abbey firm as a

the Blumenthal Plan, applied for legal fees and disbursements to be paid out of the common fund that resulted from the Settlement Agreement. Cahn sought to be reimbursed for a lodestar of 2,182 hours together with $4,698 in expenses and also for an award of 10% of the total attorneys fees awarded to class counsel of record. In regard to Cahn's application for fees, the District Court concluded that:

> [T]he efforts of Ms. Cahn did effectuate certain improvements in the Settlement Agreement which were ultimately of benefit to the class members, and ... she is therefore entitled to a reasonable fee in the nature of *quantum meruit*, limited to the efforts actually directed towards achieving the benefits obtained. Equity requires fair treatment of one who confers a benefit, even where the actor has no standing and participates as an interloper or volunteer.

*In re: Medco Health Solutions*, 2004 U.S. Dist. LEXIS 28606, at *36, 2004 WL 1243873, at *12.

Although the Settlement Agreement had been agreed upon in principle by class counsel, without any input whatever from Cahn, her participation was noted by the District Court as an important part in the finalization of the terms and provisions of the relevant documents. The District Court found Cahn's efforts to be a benefit to the class and to the plan as to "support a reasonable legal fee out of the fund in the nature of *quantum meruit.*" *In re: Medco Health Solutions*, 2004 U.S. Dist. LEXIS 28606, at *39, 2004 WL 1243873, at *13. The District Court determined, however, that there was "no basis to award a percentage fee of the recovery to Ms. Cahn. She neither created the class action settlement nor did she induce acceptance of it by the Defendants. Her assistance was limited to fine tuning of provisions and documents after the [s]ettlement had been agreed to in principle." *Id.*

The District Court determined that

> [T]he reasonable time expended by Ms. Cahn doing legal work for the benefit of the settlement class and fund[ ] is 804.4 hours; that a reasonable hourly rate for the services performed under the working conditions, in which they were rendered with little or no overhead, is $200 and that an appropriate fee award is $160,880. There seems to be no objection to the disbursements charged in the amount of $4,698 which is also awarded. The legal fee of Linda J. Cahn, Esq.,

salaried associate lawyer sometime prior to November 1997, bringing this work product, whatever it was, with her to her new employer. Until the end of 2000, she was primarily responsible for litigating the cases for the Abbey firm. It is not disputed that she was fully compensated by the Abbey firm for all her work while affiliated with that office.

...

On leaving the Boies firm, Ms. Cahn took with her the Blumenthal case (99 Civ. 4970). The ERISA Plan maintained by Blumenthal has opted out of the class action settlement, and it is clear that Ms. Cahn plans to continue to litigate the claims against Defendants in that case.

Because there was uncertainty as to whether Blumenthal would opt out of the Settlement as the plan ultimately did, or remain within the Class and file objections to the Settlement, it was the specific direction of this Court that the Settlement terms and the documentation implementing the Settlement be made available to Ms. Cahn for her consideration and response on behalf of her remaining client, prior to being finalized and prior to being submitted to this Court. Starting on September 18, 2002 and thereafter, Ms. Cahn participated in meetings, telephone conference calls, and appearances at Court with respect to implementation of the settlement.

*In re: Medco Health Solutions*, 2004 U.S. Dist. LEXIS 28606, at *36–38, 2004 WL 1243873, at *12–13.

payable out of the fund, is awarded in the amount of $160,880 together with disbursements in the amount $4,698 making a total of $165,578, which shall be deducted from the 30% award to [c]lass [c]ounsel· in light of the cap on total fees, set forth in the class notice. The foregoing findings of fact and conclusions of law concerning attorney compensation are without prejudice to any claim Ms. Cahn may make in the future in the event that she recovers a damage award in the Blumenthal case. All issues including the reasonable hourly rate for Blumenthal, where an actual attorney client relationship exists, as well as a contingency risk, will be considered anew in the event of a successful result in that continuing litigation.

*In re: Medco Health Solutions,* 2004 U.S. Dist. LEXIS 28606, at *45–46, 2004 WL 1243873, at *15.

## VIII. *Instant Appeals*

On April 22, 2004, and June 22, 2004, CareFirst filed its timely notices of appeal to this Court from the District Court's orders of March 25, 2004, and May 25, 2004, respectively. On June 16, 2004, the Self–Funded Plans—Central States, Iron Workers, and Sweetheart—collectively filed their timely joint notice of appeal. A timely notice of appeal was also filed by Cahn on June 22, 2004.

On appeal, CareFirst argued that the District Court abused its discretion in denying its motion to intervene and by refusing to hear its Rule 23 objections to class certification. CareFirst claimed that the District Court, "[w]ithout providing any analysis or explanation, ... summarily denied [its] motion to intervene in the face of facts that, to the contrary, compelled the conclusion that CareFirst was entitled to intervene as of right under [Rule 24(a)(2) ]." CareFirst claimed that as a TPA, it is bound to act by contract and course of dealing on behalf of the self-funded plans that it administers in order to "pursue overpayment of benefits." CareFirst further argued that as a result of the District Court having denied its motion to intervene, its claims as an insurer are released without compensation, thereby "impairing [its] contract rights as a TPA." CareFirst asserted that "[i]nsurers and TPAs were specifically carved from the class, yet the plans they insured and administered were included."

In regard to the District Court's certification of the class, CareFirst claims that (i) the "settlement class claims do not raise questions common to all class members"; (ii) the "proposed class should not have been certified because the class representatives' claims are not typical of those of the class"; and (iii) the "class should not have been certified because the class representatives do not adequately represent the interests of the class." Finally, CareFirst argues that the District Court improperly prevented CareFirst from opting out its insured claims from the class, which, according to CareFirst, allows Medco later to argue—in the New Jersey action discussed above—that the Settlement Agreement releases CareFirst's insured claims by "distributing proceeds directly to CareFirst's insured customers, thus bypassing CareFirst." CareFirst also objects to the District Court's approval of the amended Settlement Agreement, as set forth in its order dated May 25, 2004.

Movants–Appellants—CareFirst and the Self–Funded Plans (Central States, Iron Workers, and Sweetheart)—object to the District Court's certification of the class, claiming that the District Court abused its discretion in certifying the class. Specifically, Movants–Appellants claim that the class was improperly certified by the District Court because the self-funded Plans represent a "subclass" whose interests dif-

fer from the insured Plans (who, according to the Movants–Appellants, "paid set premiums to insurers and bore no risk of increased drug costs"), because self-funded Plans paid Medco the entire cost of the drugs that they in turn provided to their beneficiaries and participants, and, accordingly, the self-funded Plans within the class should have been represented by individual and independent counsel, and should not have been included in the certified class.

The three Self–Funded Plans argued that their "interests," and those of all self-funded Plans, substantially conflict with the interests of the rest of the class, the insured plans. The Self–Funded Plans also asserted that there is a lack of "commonality" and "typicality" among the class members. The Self–Funded Plans grounded their objections in this appeal on the fact that there are purportedly different levels of damages for self-funded Plans and insured or capitated Plans.

On appeal, Cahn also claimed, *inter alia,* that the District Court abused its discretion in failing to award her a percentage fee of the recovery.

Finally, Movants–Appellants collectively asserted that none of the named Plaintiffs remaining have demonstrated an injury-in-fact, which is necessary to demonstrate the standing requirements under Article III. Movants–Appellants argue that the Individual Plaintiffs were unable to demonstrate a cognizable injury and that the Individual Plaintiffs sought to obtain derivative relief under ERISA on behalf of the Plans to which they belonged, in addition to all other Plans that contracted with Medco and received prescription-benefit coverage from Medco during the certified class period. Moreover, the Movants–Appellants argued that the Individual Plaintiffs have failed to assert and demonstrate injuries stemming or resulting from Med-

co's alleged wrongdoings to the Plans to which the Individual Plaintiffs belong.

Regarding Janazzo, the trustee for her Plan, which purportedly had contractual relations with Medco, the Movants–Appellants claim that she was unable to produce her Plan's purported contract to obtain prescription benefit coverage from Medco and that, therefore, could not demonstrate that her Plan incurred the requisite injury-in-fact from Medco's allegedly wrongful provision of such coverage.

## DISCUSSION

### I. *Article III Standing*

■■■ This Court's review of whether a plaintiff has constitutional standing is *de novo. Shain v. Ellison,* 356 F.3d 211, 214 (2d Cir.2004). The Supreme Court has held:

> This inquiry [regarding plaintiffs' standing] involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society.
>
> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on *his* behalf. The Art. III judicial power exists only to redress or otherwise to protect against injury to the

complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal citations omitted). Under Article III of the Constitution, federal courts have jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim. Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte. See United States v. Quinones*, 313 F.3d 49, 57–58 (2d Cir. 2002); *United States v. Viltrakis*, 108 F.3d 1159, 1160 (9th Cir.1997); *see also, e.g., Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir.1998) (noting that because of the "Article III limitations on judicial power . . . the [C]ourt can raise [an Article III issue] *sua sponte*, and, indeed, can do so for the first time on appeal" (internal quotation marks omitted)).

■ Three elements make up the "irreducible constitutional minimum of standing." *See Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. In order to have constitutional standing, first, the plaintiffs "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." *Id.* at 560–61, 112 S.Ct. 2130 (internal quotation marks omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. 2130 (internal quotation marks omitted). Moreover, the "party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing that he has suffered a concrete injury, or is on the verge of suffering one. *See id.*

■ Without a plaintiff's satisfaction and demonstration of the requirements of Article III standing, a federal court has no subject matter jurisdiction to hear the merits of a plaintiff's—or, in this case, the class plaintiffs'—claim: "Without jurisdiction [a] court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868)). This Court must examine not only its own jurisdiction but also whether a district court had jurisdiction to hear the plaintiff's case in the first instance:

> Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it. . . . [When the lower federal court] lacks jurisdiction, [an appellate court] has jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.

*Id.* at 95, 118 S.Ct. 1003 (internal quotation marks and citations omitted); *see id.* at 97 n. 2, 118 S.Ct. 1003 (noting that a "merits question cannot be given priority over an Article III question").

## II. *Article III Standing of the Class Representatives*

 The Supreme Court has held that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendant[ ], none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Moreover, the named class plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth,* 422 U.S. at 502, 95 S.Ct. 2197; *see also Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (noting that Article III standing requirements are "no less true with respect to class actions than with respect to other suits"); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) ("That a suit may be a class action, however, adds nothing to the question of standing ...."); *Allee v. Medrano,* 416 U.S. 802, 828–29, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) ("[A] named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.") (Burger, C.J., concurring in the result in part and dissenting in part). Moreover, this Court has held that class representatives must have standing, although a class member may still be a class member despite the class representative's claim having expired:

> Generally, the moving plaintiffs are correct in stating that special standing rules exist for class representatives. Although, upon certification of a class, the class representative must have individual standing, class representatives may continue to represent a class even if their individual claims become moot.

*Martens v. Thomann,* 273 F.3d 159, 173 n. 10 (2d Cir.2001) (internal citation omitted).

 Assuming, without deciding, that Plaintiffs have demonstrated statutory standing, such standing "does not necessarily provide constitutional standing." *Bollig v. Christian Comm. Homes and Servs., Inc.,* 2003 WL 23200362, at *2 (W.D.Wis. July 10, 2003), *amended by* 2003 WL 23211142 (W.D.Wis. Oct.27, 2003), (alteration in original) (quoting *Carducci v. Aetna U.S. Healthcare,* 247 F.Supp.2d 596, 621 (D.N.J.2003)). Courts have, however, recognized that a plan participant may have Article III standing to obtain injunctive relief related to ERISA's disclosure and fiduciary duty requirements without a showing of individual harm to the participant. In *Horvath v. Keystone Health Plan East, Inc.,* 333 F.3d 450 (3d Cir. 2003), the Third Circuit noted that:

> Here, the *disclosure requirements* and *fiduciary duties* contained in ERISA create in Horvath certain rights, including the rights to receive particular information and to have Keystone act in a fiduciary capacity. Thus, Horvath need not demonstrate actual harm in order to have standing to seek *injunctive relief* requiring that Keystone satisfy its statutorily-created disclosure or fiduciary responsibilities. *See Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1148 (3d Cir. 1993) (finding "ERISA does not require that harm be shown before a plan partic-

ipant is entitled to an injunction ordering the plan administrator to comply with ERISA's reporting and disclosure requirements").

333 F.3d at 456–57 (emphasis added) (citing *Financial Inst. Retirement Fund v. Office of Thrift Supervision*, 964 F.2d 142, 149 (2d Cir.1992) (noting that "ERISA's goal of deterring fiduciary misdeeds" supports a "broad view of participant standing under ERISA," and holding that a violation of § 404 under ERISA, 29 U.S.C. § 1104, satisfies the injury requirement of Article III)). *See generally* 29 U.S.C. § 1104 (setting forth the duties of a Plan fiduciary, with such duties being "solely in the interest of the [Plan] participants and beneficiaries").

■ Requests for restitution or disgorgement under ERISA are different from requests for injunctive relief. Obtaining restitution or disgorgement under ERISA requires that a plaintiff satisfy the strictures of constitutional standing by "demonstrat[ing] individual loss," *Horvath*, 333 F.3d at 456 (citing *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 159 (3d Cir. 1999)); *see also Bollig*, 2003 WL 23200362, at *2; to wit, that they have suffered an injury-in-fact. In *Horvath*, the Third Circuit held that while the plaintiff had standing under ERISA to seek injunctive relief, the class representative lacked Article III standing to assert claims for restitution or disgorgement because she did not allege that she was personally affected by the alleged breach. 333 F.3d at 456. Statutes do not abdicate the standing requirements of the Constitution. *See Raines v. Byrd*, 521 U.S. 811, 820 n. 3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue a plaintiff who would not otherwise have standing.").

■ The Eighth Circuit has also held that an ERISA Plan participant or beneficiary must plead a direct injury in order to assert claims on behalf of a Plan. *See Harley v. Minn. Mining and Manufacturing Co.*, 284 F.3d 901, 906–07 (8th Cir. 2002) (determining that there was no constitutional standing because the "loss did not cause actual injury to plaintiff's interests in the plan" and determining that the "limits on judicial power imposed by Article III counsel against permitting participants or beneficiaries who have suffered *no* injury in fact from suing to enforce ERISA fiduciary duties on behalf of the Plan"), *cert. denied*, 537 U.S. 1106, 123 S.Ct. 872, 154 L.Ed.2d 775 (2003); *see also Marantz v. AdvancePCS Inc.*, No. CIV 01–2413 (D.Ariz.2003); *Minshew v. Express Scripts, Inc.*, No., 4:02cv1503 (E.D.Mo. Jan. 15, 2003).

■ Here, despite the issue of constitutional standing having been brought to the attention of the District Court by various parties on numerous occasions throughout the litigation—in regard to both the Individual Plaintiffs as Plan beneficiaries and Janazzo as a Plan trustee who failed to produce evidence of a relationship between her Plan and Medco—we do not have the benefit of the District Judge's views as to whether the Plaintiffs have demonstrated the requisite injury-in-fact for supporting a finding of constitutional standing. The District Judge repeatedly failed to rule on whether any of the Plaintiffs had Article III standing to bring the class action and to enter into the Settlement Agreement.

On March 13, 2001, it was brought to the District Judge's attention that Janazzo had been unable to produce evidence of a direct or indirect contractual relationship with Medco. The District Judge recognized that this failure could require dismissal of Janazzo's case, but refused to

order additional discovery and noted that the four Individual Plaintiffs' cases could still proceed. On February 18, 2003, Medco, through its counsel, sent a letter to the District Judge noting then-recent cases involving ERISA plan beneficiaries and Article III standing. When Plaintiffs moved to preliminarily certify the class with Janazzo and the Individual Plaintiffs as named representatives in May of 2003, these standing issues had yet to be resolved. After this motion, it was again pointed out to the District Judge, on May 12, 2003, that several other then-recent cases in other jurisdictions cast doubt on the Article III standing of the Individual Plaintiffs and that Janazzo still had not produced evidence of a direct or indirect contractual relationship between her plan and Medco.

On June 2, 2003, Plaintiffs claimed that they did have standing, but premised their assertion on statutory standing under ERISA; as we have noted, statutory standing will not suffice to substitute for Article III standing. On June 3, 2003, the issue of standing was again raised. Cahn argued that the Individual Plaintiffs lacked Article III standing, notwithstanding their statutory standing under ERISA. *See* 29 U.S.C. § 1132. The District Judge responded: "I think it's fair to say that they have a statutory standing derivatively and that they would have standing in any event until such a point as the plan fiduciary pulls the rug out from under them.... However, if they have one plan, that's

certainly sufficient for standing." Transcript at 16, *Gruer, et al v. Merck–Medco Managed Care, LLC,* No. 99 Civ. 4970(CLB) (S.D.N.Y. June 3, 2003).[10] When Cahn then argued that Janazzo still had not proven constitutional standing, the District Judge responded: "Well, as long as you opt out of the settlement, it's hard for me to see how you're aggrieved, your clients." *Id.* at 17. When Cahn continued to argue her point, the District Judge stated: "But you don't have any standing to complain about it, do you?" *Id.* Cahn answered that she was only "calling it to the Court's attention," to which the Judge responded: "Thank you, very much. I'll take it under consideration." *Id.* at 17–18.

Nevertheless, these issues of standing remained unresolved when the District Judge preliminarily approved the class by its Order of July 31, 2003, with only Janazzo and the Individual Plaintiffs as "certified [c]lass [r]representitives." On December 9, 2003, Plaintiffs' counsel stated in a Joint Declaration justifying attorneys' fees, that their named Plaintiffs were at risk for having their cases dismissed due to the named Plaintiffs' lack of standing:

> [I]n the years since these actions were commenced, several courts have questioned the standing of participants and beneficiaries to sue for the benefit of [P]lans in the absence of some showing of direct injury to the participants themselves, and a very similar action has been dismissed for lack of such standing.

**10.** There are other instances where the District Judge appeared to have accepted Plaintiffs' argument that statutory standing was sufficient: (i) "I don't think there is any question that a beneficiary can sue ...," Transcript at 43, *In re: Medco Health Solutions Inc., Pharmacy Benefits Management Litigation,* No. 03 MDL 1508(CLB) (S.D.N.Y. Dec. 11, 2003) ("Tr. of Dec. 11, 2003"); and (ii) "I think that if Congress tells me I can sue, it takes a certain amount of temerity for the Eighth Circuit to tell me I can't," Transcript

at 38, *In re: Medco Health Solutions Inc.,* No. 03 MDL 1508(CLB) (S.D.N.Y. May 12, 2003). Further, there are instances in which the District Judge appeared to have accepted the claim that beneficiaries have a "derivative right," pursuant to ERISA, 29 U.S.C. § 1132, to sue: "[Beneficiaries] probably have an inherent right to sue derivatively." Tr. of Dec. 11, 2003, at 43. Nothing in the Record, however, indicates that the District Judge ever ruled on the issue of constitutional standing.

The risk of having these cases dismissed in their entirety on this or other grounds was very real.

Joint Declaration of December 9, 2003, *In re: Medco Health Solutions Inc.*, No. 03 MDL 1508(CLB), at 32, ¶ 67 (S.D.N.Y. Dec. 18, 2003 (entered)). On December 11, 2003, objections to the standing of Plaintiffs were again raised on the same grounds as before. On May 25, 2004, when the District Judge gave final approval to class certification and settlement, the District Court still had not ruled on the issue of constitutional standing.

Given the foregoing and the Record before us, serious questions remain as to whether the Individual Plaintiffs have demonstrated how Medco's alleged wrongdoings caused any injury to any individual or entity other than the Plans that Medco contracted with, and provided prescription benefit coverage to, during the class period.[11] It is especially unclear whether any evidence supports the claim that Medco's drug-switching programs and formulary caused the Individual Plaintiffs—as opposed to the Plans to which they belong—any injury (either by paying more for prescription drugs or by having to take different prescription drugs), given that Plan participants generally pay a flat co-pay for a drug regardless of the cost of the drug. Seemingly, only plan participants who paid percentage coinsurance would incur injury if Medco favored the higher-cost drugs. In regard to Medco's drug-switching programs, the only injury that the Individual Plaintiffs appeared to have alleged was an increase in the cost of the drugs to the employer Plans in which they participated, but in which they serve no fiduciary role in administering. Moreover, such an increase in cost would in all probability not affect the Individual Plain-

---

11. In the amended Settlement Agreement, the parties again refer to Medco's alleged wrongdoings in the context of the ERISA Plans, simply stating that "Merck and Medco have participated in prohibited transactions within the meaning of ERISA; and that Medco's clients have suffered damages as a result of such conduct." The Class Notice's description of the class action also described in substantial part the alleged breach of Medco's fiduciary duties in regard to the clients that it contracted with—to wit, the Plans:

> [T]he Action alleges that Medco has a fiduciary duty under ERISA because it has discretionary authority over the management and administration of employee benefit [P]lans' prescription benefit coverage. Plaintiffs allege that, as an ERISA fiduciary, Medco is obligated to act solely in the interests of the beneficiaries of the employee benefit [P]lans with which it contracts. Plaintiffs allege that, during the Class Period, Medco and Merck breached their fiduciary duties under ERISA in several ways. First, Plaintiffs allege that Medco's formulary-related decisions violate Medco's fiduciary obligations under ERISA because, in making formulary decisions, Medco systematically favors the products of its parent company, Merck, as well as certain products of other drug manufacturers that pay Medco discounts and rebates, in order to increase the market share of Merck and the profits of Merck and Medco at the expense of the interests of the Plans. Second, Plaintiffs allege that Medco breached its fiduciary obligations under ERISA by developing programs to cause pharmacists and physicians to switch Plan beneficiaries' prescribed drugs to Merck's products in a manner that may increase cost to Plans. Third, Plaintiffs allege that Medco breached its fiduciary duties to Plans by entering into contracts with drug manufacturers that increase the costs and market share of Merck products to the detriment of the Plans. Plaintiffs allege further that Plans delegate authority to Medco to manage the pharmacy benefit plans, and to communicate to Plans and beneficiaries, and that Medco is an ERISA fiduciary with respect to all disclosures it makes to Plans. Plaintiffs allege that Medco breached its fiduciary duties by making affirmative misrepresentations of fact to Plans and their beneficiaries and by failing to disclose material facts affecting the interests of Plans and beneficiaries.

Class Notice at 2.

tiffs absent a demonstration that they purchased drugs based upon percentage coinsurance payments or some other demonstration of individualized harm. Similarly, the Individual Plaintiffs appear to have failed to demonstrate (i) that they incurred an injury resulting from Medco's failure to pass along formulary rebates to the Plans; or (ii) that they have been impacted by defendants' allegedly wrongful disclosures or misstatements.

The parties also have raised a considerable question regarding whether the fifth settling plaintiff, Janazzo, a Plan trustee, represents a Plan with Article III standing, given that Janazzo failed to produce a signed, executed contract between the Plan and either Medco or a TPA that contracted with Medco. Moreover, counsel for Medco also stated before the District Court that it "could not find any record of Medco sending a bill to County Line Buick [Janazzo's Plan] for drugs. [Medco does not believe] that [Janazzo's Plan is] a client of Medco." In the absence of evidence of a contractual relationship with Medco, Janazzo is precluded from demonstrating any injury resulting from Medco's alleged wrongdoings.

It seems clear that the trustees of the Blumenthal Plan had constitutional standing and were proper named plaintiffs at the time that the actions were consolidated and at the time that the Individual Plaintiffs made their motion for class certification and approval of the Settlement Agreement. It therefore appears that the trustees of the Blumenthal Plan were qualified to serve as class representatives at that time. However, the Class Notice indicated that the Blumenthal Plan would either opt out or remain in the class and object to the Settlement Agreement.[12] Although the specific point at which the Blu-

menthal Plan opted out is not clear, it is apparent that the trustees of the Blumenthal Plan were no longer parties to the class action at the time of the final judgment certifying the class and approving the Settlement Agreement.

An examination of the Record before us reveals that factual and legal issues bearing on the Article III standing of the Plaintiffs remain unresolved in the District Court. Jurisdictional questions of the sort presented here should be addressed in the first instance by the District Court. Until the jurisdictional question is decided, we cannot address the other issues presented on this appeal: whether the motion for intervention should have been granted; whether the class was properly certified; whether objections to the Settlement Agreement were meritorious; and whether the award of attorneys fees was fair and reasonable. We will defer ruling on these matters until the District Court decides the jurisdictional question in the first instance. Accordingly, we will remand to the District Court for that purpose, leaving the District Court free to resolve the Article III standing question identified in this Opinion in any way it deems proper. Following the District Court's decision, any party to this appeal may restore jurisdiction to this Court within thirty days by letter to the Clerk's Office seeking review. The letter will inform the Clerk that the case will be heard by this Panel upon letter briefs to be filed according to a schedule set by the Clerk. *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir. 1994).

## CONCLUSION

In accordance with the foregoing, we vacate the Judgement of the District Court

---

12. The Class Notice stated that "[i]t is anticipated that the [p]laintiff Plan in the Blumen-

thal action will either exclude itself from or object to the Settlement [Agreement]."

and remand for further consideration and proceedings consistent herewith, with jurisdiction to be restored to this Court in the manner provided.