09-4901-cv
Faber v. Metropolitan Life Insurance Company

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: November 8, 2010                    Decided: August 5, 2011)

Docket No. 09-4901-cv

_____

CAROL D. FABER and the ESTATE OF RUSSELL E. YOUNG, by its Administrator, TONIA M. RAY, Individually and on behalf of a class of all others similarly situated,

*Plaintiffs-Appellants*,

v.

METROPOLITAN LIFE INSURANCE COMPANY,

*Defendant-Appellee*.[*]

Before: FEINBERG, B.D. PARKER, and WESLEY, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the Southern District of New York (Baer, *J.*) dismissing the complaint for failure to state a claim for breach of fiduciary duties under ERISA.

AFFIRMED.

_____

> JOHN C. BELL, JR. (Leroy W. Brigham, *on the brief*), Bell & Brigham, Augusta, GA, *for Plaintiffs-Appellants*.
>
> MICHAEL H. BERNSTEIN (John T. Seybert, *of counsel*), Sedgwick, Detert, Moran & Arnold, LLP, New York, NY, *for Defendant-Appellee*.

---

[*] The Clerk of Court is directed to amend the official caption to read as shown above.

M. Patricia Smith, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor, Nathaniel I. Spiller, Counsel for Appellate Litigation, Thomas Tso, Attorney, *for Amicus Curiae U.S. Department of Labor*.

BARRINGTON D. PARKER, *Circuit Judge*:

Plaintiffs-Appellants Carol D. Faber and the Estate of Russell E. Young (the "Estate") appeal from a judgment of the United States District Court for the Southern District of New York (Baer, *J.*) dismissing their class-action complaint, which asserts a single claim against Defendant-Appellee Metropolitan Life Insurance Company ("MetLife") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiffs allege that through the use of "retained asset accounts" ("RAAs"), MetLife breached fiduciary duties imposed by ERISA by retaining and investing for its own profit life insurance proceeds due them under employee benefit plans that MetLife administered. *See id.* §§ 1104(a), 1106(b)(1). An RAA is an interest-bearing account backed by funds that the insurer retains until the account holder writes a check or draft against the account. We conclude that the district court correctly determined that Plaintiffs fail to state a claim, since MetLife discharged its fiduciary obligations under ERISA when it established the RAAs in accordance with the plans at issue, and did not misuse "plan assets" by holding and investing the funds backing the accounts. Accordingly, we affirm.

## BACKGROUND

The relevant facts are undisputed. Plaintiffs were beneficiaries of ERISA-governed employee welfare benefit plans. Faber was a beneficiary of a plan sponsored by her late

husband's employer, the Eastman Kodak Company (the "Kodak Plan"). The Estate was a beneficiary of a plan sponsored by the late Russell E. Young's employer, the General Motors Corporation (the "GM Plan"). Both Plans provide life insurance benefits funded by group life insurance policies issued to Kodak and GM by MetLife, the claims administrator for the Plans.

Under the Plans, if the life insurance proceeds due to a beneficiary exceed a specified amount, MetLife establishes an RAA, branded a "Total Control Account" ("TCA"), in the name of the beneficiary, credits the TCA with the amount of benefits due, and issues the beneficiary a "checkbook" that he can use at any time to draw on the TCA for some or all of the balance. The Summary Plan Description ("SPD") for the Kodak Plan states:

> Payment of a death benefit of $7,500 or more is made under MetLife's Total Control Account. The death benefit amount is deposited in an interest bearing money market account and your beneficiary is provided with a checkbook to use for writing checks to withdraw funds. Other payment options are available. However, if the total death benefit is less than $7,500, a lump sum payment will be made.

Similarly, the SPD for the GM Plan states:

> If the benefit from a single claim is $6,000, or more, your beneficiary may receive basic life insurance benefits under one of the several options available under the Beneficiary's Total Control Account (TCA) Program. The TCA Program provides your beneficiary with total control of the proceeds from your life insurance. A personalized checkbook allows your beneficiary to easily use all, or a portion, of the money. Funds left with the insurance company earn interest at competitive rates. Several investment options also are available under TCA. A separate brochure describing the TCA options is available on request from the GM National Benefit Center.

When a TCA is set up, MetLife sends the beneficiary a "Total Control Account Money Market Option Customer Agreement" ("Customer Agreement"), which lays out the terms of the

3

TCA relationship. The Customer Agreement provides that MetLife will set the interest rate for the TCA weekly based on the performance of certain money market indices. MetLife fully guarantees both the balance of the TCA and that the annual yield on the account will be at least 1.5%. While the TCA remains open, MetLife retains the funds backing the TCA in its general account and invests those funds for its own profit, earning the spread between its return on investment and the interest paid on the TCA. When the TCA holder writes a check against the account, MetLife transfers funds sufficient to cover the draft to the bank servicing the TCA.

Faber and the Estate submitted claims for death benefits in 2004 and 2007, respectively. Once their claims were approved, MetLife established TCAs in their names and provided them with Customer Agreements and checkbooks. The opening balance of Faber's TCA was $393,651.90, while the Estate's was $42,765.48. The Estate withdrew all of its proceeds in 2007 and its TCA was closed. Faber has written checks against her TCA over the years, but it remains open with a positive balance.

Although Plaintiffs do not dispute that they have received the entire amount of the life insurance proceeds and interest guaranteed to them under the Plans, they brought a putative class action on behalf of all persons who were, between 2002 and 2009, beneficiaries of MetLife group life insurance policies that paid benefits via TCAs. The complaint alleges that by using the TCA mechanism to retain and invest the proceeds due to beneficiaries, MetLife breached section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), which requires a fiduciary to act solely in the interest of plan participants and beneficiaries, and section 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1), which prohibits a fiduciary from self-dealing in plan assets. Plaintiffs seek disgorgement of MetLife's profits, as well as injunctive relief.

4

In 2009, the district court granted MetLife's motion to dismiss the complaint. *Faber v. Metro. Life Ins. Co.*, No. 08 Civ. 10588 (HB), 2009 U.S. Dist. LEXIS 98775 (S.D.N.Y. Oct. 23, 2009). The court first concluded that Plaintiffs lacked constitutional standing to seek disgorgement because they had failed to show the requisite injury, but that they did have constitutional standing to seek injunctive relief. *Id.* at \*10-19. The court presumed—but declined to decide—that Plaintiffs had statutory standing, and held that the complaint failed to state a claim under ERISA because "Plaintiffs received all of the benefits to which they were entitled under the Plans." *Id.* at \*25. The court focused on "the parties' expectations under the Plans," concluding that the fact that MetLife had furnished Plaintiffs with all of the benefits promised by the Plans, in the manner provided for by the Plans, foreclosed their claims. *See id.* at \*23-28. Plaintiffs appealed.

Following oral argument, we invited the Department of Labor ("DOL") to submit its views on certain of the issues presented. In response, the DOL took the position that MetLife discharges its ERISA fiduciary duties by furnishing beneficiaries a TCA in accordance with plan terms and does not retain plan benefits by holding and managing the assets that back the TCA. In the DOL's view, once MetLife creates and credits a beneficiary's TCA and provides a checkbook, the beneficiary "has effectively received a distribution of all the benefits that the Plan promised," and "ERISA no longer governs the relationship between MetLife and the . . . account holder[]." We conclude that the DOL's reasoning comports with ours, and we affirm.

## DISCUSSION

### I. Standing

We review constitutional standing de novo and, at the pleading stage, accept as true all material allegations of the complaint, which we must construe in Plaintiffs' favor. *W. R. Huff*

*Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). The three elements comprising Article III standing are well established: a plaintiff must show (1) an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the plaintiff's injury and the challenged conduct; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In the ERISA context, we have drawn a distinction between constitutional standing to seek injunctive relief and constitutional standing to seek disgorgement. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199-200 (2d Cir. 2005) ("*Central States I*"); *see also Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 119-21 (2d Cir. 2009). In *Central States I*, we observed that a plaintiff "may have Article III standing to obtain injunctive relief related to ERISA's . . . fiduciary duty requirements without a showing of individual harm," whereas "[o]btaining restitution or disgorgement under ERISA requires that a plaintiff satisfy the strictures of constitutional standing by demonstrating individual loss; to wit, that they have suffered an injury-in-fact." 433 F.3d at 199 (citation and internal quotation marks omitted); *see also id.* ("[The] *fiduciary duties* contained in ERISA create in [plaintiff] certain rights, including the right[] . . . to have [defendant] act in a fiduciary capacity. Thus, [plaintiff] need not demonstrate actual harm in order to have standing to seek *injunctive relief* requiring that [defendant] satisfy its statutorily-created . . . fiduciary responsibilities." (quoting *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 456-57 (3d Cir. 2003))).

We agree with the district court insofar as it concluded that *Faber* has constitutional standing to seek injunctive relief. The complaint alleges that MetLife, by retaining and investing plan assets for its own profit, violates the fiduciary duties imposed by sections 404(a) and 406(b)(1) of ERISA. Under *Central States I*, these allegations are a sufficient predicate for standing to seek injunctive relief.

MetLife does not contest this conclusion, but rather argues that Faber cannot establish that an injunction is likely to redress her alleged injury because if she is displeased with her TCA, she can simply resort to the "self-help" remedy of withdrawing the balance and closing the account. MetLife's argument misconstrues the redressability element of Article III standing, which obligates a court to consider whether judicial intervention is likely to rectify the injury, not whether the plaintiff might possess other non-legal remedies. Moreover, as the district court noted, such "self-help" would deprive Faber of the very salutary features of the TCA program that MetLife itself touts, including, for example, the accrual of interest at a guaranteed rate of at least 1.5%. *Faber*, 2009 U.S. Dist. LEXIS 98775, at *19. In sum, Faber—whose TCA remains open, unlike the Estate's—has alleged an ongoing violation of her statutorily-created rights under sections 404 and 406 that would likely be redressed by prospective injunctive relief.

In addition to establishing constitutional standing, an ERISA plaintiff must establish statutory standing. *Kendall*, 561 F.3d at 118. Plaintiffs sue under ERISA section 502(a)(3), which provides that an action for injunctive or other equitable relief may be brought by a "beneficiary," 29 U.S.C. § 1132(a)(3), defined as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder," *id.* § 1002(8). MetLife contends that because Plaintiffs received all of the benefits to which they were entitled under the Plans, they ceased to be ERISA beneficiaries and thus lack statutory

standing. Plaintiffs rejoin that they remain beneficiaries because they have a colorable claim to recover MetLife's allegedly illicit profits, which, they assert, qualify as "benefits" for standing purposes. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1417-19 (9th Cir. 1988) (finding that an ERISA fiduciary's "ill-gotten profits" may be construed as "equitably vested benefits" for purposes of § 1132(a), even if plaintiffs have already received their "actuarially vested plan benefits"). The district court declined to resolve this issue, instead electing to presume that Plaintiffs have statutory standing. This approach was appropriate because "statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action." *Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) (citation omitted)).

Accordingly, we assume, without deciding, that Faber has statutory standing and proceed to the merits. *Cf. Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241-43 (2d Cir. 2007) (concluding that one named plaintiff in ERISA class action had standing and proceeding to the merits of the appeal, without reaching whether any of the other named plaintiffs had standing). We are comfortable with this approach because our merits analysis does not depend on whether Faber also has standing to seek disgorgement, or on whether the Estate has standing. In light of our ultimate conclusion that the complaint fails to state a claim, we are not required to answer these questions.

**II.     Merits**

We review de novo the dismissal of a complaint for failure to state a claim. *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009). In conducting this review, we draw all reasonable inferences in Plaintiffs' favor, "assume all 'well-pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting

8

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)). We are not, however, "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (Sotomayor, J.) (internal quotation marks omitted).

The fiduciary provisions of ERISA derive from the common law of trusts, *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989), and should, as a general matter, be broadly construed, *see John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96 (1993); *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997). An entity is an ERISA fiduciary with respect to an employee welfare benefit plan to the extent it "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Section 404(a) of ERISA requires a fiduciary to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." *Id.* § 1104(a)(1). Section 406(b) prohibits a fiduciary from engaging in certain transactions, including "deal[ing] with the assets of the plan in [its] own interest or for [its] own account. *Id.* § 1106(b)(1). An ERISA fiduciary is also obligated to follow the terms of the plan, so long as they do not conflict with the statute. *Id.* § 1104(a)(1)(D).

In essence, Plaintiffs allege that MetLife used the TCA mechanism to misappropriate plan assets. Specifically, they allege that MetLife violated § 1104(a)'s "exclusive purpose" requirement and § 1106(b)(1)'s prohibition against self-dealing by retaining in its general account the funds backing their TCAs and investing those funds for its own benefit. These claims fail. MetLife discharged its fiduciary obligations as a claims administrator and ceased to

be an ERISA fiduciary when, in accordance with the Plans, it created Plaintiffs' TCAs, credited them with the amount of benefits due, and issued checkbooks enabling Plaintiffs to withdraw their proceeds at any time. Thus, MetLife was not acting in a fiduciary capacity when it invested the funds backing Plaintiffs' TCAs.

The sponsor of an employee welfare benefit plan is generally afforded wide latitude to design the plan, including the mechanism for distributing benefits, as it sees fit. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999) (plan sponsor makes the "decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated"); *Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 916 (2d Cir. 1982) ("Neither [ERISA] nor its legislative history comments on the mode or manner in which benefits should be paid."). Plan sponsors Kodak and GM were free, for example, to design their Plans to pay life insurance benefits in lump sums. But that is not what they did. Instead, the SPDs expressly provide that death benefits will be paid through the establishment of a TCA, and MetLife acted in accordance with these provisions. Nothing in the SPDs, or in the complaint, provides any indication that after the TCAs were established either Plaintiffs or MetLife contemplated an indefinite fiduciary relationship. As the district court recognized, once the TCAs were set up and credited, MetLife had provided all of the benefits promised by the Plans, in the manner contemplated by the Plans. To the extent MetLife remained obligated to honor the account holder's "checks" and pay interest at a guaranteed rate, we believe that this arrangement constituted a straightforward creditor-debtor relationship governed by the Customer Agreements and state law, not ERISA.

Nor are we persuaded by Plaintiffs' contention that MetLife remained an ERISA fiduciary after establishing the TCAs because the funds in its general account backing them

10

qualified as plan assets, *see* 29 U.S.C. § 1002(21)(A) (an entity is an ERISA plan fiduciary to the extent it exercises any authority or control respecting management or disposition of the plan's assets). As an initial matter, the parties seem to agree that prior to the creation of a TCA, the funds in MetLife's general account are *not* plan assets; rather, the MetLife group life insurance policies are. *See id.* § 1101(b)(2) ("In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer."). Plaintiffs contend, however, that once benefits become due and payable and a TCA is established, a portion of the funds in MetLife's general account equal to the TCA balance—as well as any profits MetLife makes by investing those funds—become plan assets.[1]

ERISA's limited definition of "plan assets" is neither helpful nor applicable here. *See id.* § 1002(42).[2] However, the DOL, the agency charged with administering and enforcing Title I of ERISA, has repeatedly advised that plan assets should be identified based on "ordinary notions of property rights." *See, e.g.*, U.S. Dep't of Labor, Advisory Op. No. 93-14A (May 5, 1993) (plan assets will "include any property, tangible or intangible, in which the plan has a beneficial ownership interest," considering "any contract or other legal instrument involving the plan, as

----

[1] Because, as explained herein, ERISA no longer governs the relationship between MetLife and a beneficiary once a TCA is established in accordance with the Plans, the above-referenced "guaranteed benefit policy" exemption of § 1101(b)(2) is no longer implicated at that point.

[2] Section 1002(42) states that "the term 'plan assets' means plan assets as defined by such regulations as the Secretary [of Labor] may prescribe, except that under such regulations the assets of any entity shall not be treated as plan assets if, immediately after the most recent acquisition of any equity interest in the entity, less than 25 percent of the total value of each class of equity interest in the entity is held by benefit plan investors . . . ." 29 U.S.C. § 1002(42).

11

well as the actions and representations of the parties involved").[3]  Agency interpretations in opinion letters are "entitled to respect" to the extent they have the "power to persuade." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  As we have before, we find the DOL's approach of defining "plan assets" consistent with "ordinary notions of property rights" persuasive and entitled to *Skidmore* deference.  *See In re Halpin*, 566 F.3d 286, 289-92 (2d Cir. 2009) (applying DOL's approach and noting that "[a] commonly understood definition of 'assets' ensures that plans and related parties can look to an established body of rules and principles to structure relationships"); *accord Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 647 (8th Cir. 2007) (applying DOL's approach); *In Re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005) (same).

Applying this approach, we agree with the DOL that MetLife's "retained assets" are not "plan assets" because the Plans do not have an ownership interest—beneficial or otherwise—in them.  Nothing in the SPDs or Customer Agreements suggests that general account funds become plan assets once MetLife gives a beneficiary control of his proceeds through a TCA.  *Cf. Halpin*, 566 F.3d at 290 (recognizing that the parties were "free to contractually provide for some other result" that would have rendered the assets in question plan assets, but had not done so).  Once the TCAs were credited, MetLife's remaining obligations are to honor checks drawn on the TCAs and to pay interest at the stipulated rate.  We believe that, under ordinary notions of property rights, this relationship involves MetLife simply as a debtor and the beneficiary-turned-account holder simply as a creditor—a relationship fundamentally different from an ERISA

---

[3] *See also, e.g.*, U.S. Dep't of Labor, Advisory Op. No. 2005-08A (May 11, 2005); U.S. Dep't of Labor, Advisory Op. No. 2001-02A (Feb. 15, 2001); U.S. Dep't of Labor, Advisory Op. No. 94-31A (Sept. 9, 1994); U.S. Dep't of Labor, Advisory Op. No. 92-22A (Oct. 27, 1992).

fiduciary relationship with its panoply of discretionary authority and responsibility, *see* 29 U.S.C. § 1002(21).

In arguing that those funds were plan assets, and that MetLife continued to act as an ERISA fiduciary, Plaintiffs rely primarily on the First Circuit's decision in *Mogel v. UNUM Life Insurance Co. of America*, 547 F.3d 23 (1st Cir. 2008). *Mogel* involved an analogous claim that UNUM had breached its ERISA fiduciary duties under §§ 1104 and 1106 by retaining and investing plaintiffs' death benefits through the use of RAAs. *Id.* at 25. In *Mogel*, however, the UNUM group life insurance policies at issue expressly provided that "payment for loss of life will be made in *one lump sum*." *Id.* (emphasis added). Acting inconsistently with these terms, UNUM's practice was to open RAAs and issue checkbooks instead of tendering lump-sum payments. *Id.* The First Circuit vacated the dismissal of the complaint, rejecting UNUM's argument that its ERISA fiduciary duties ended when it established an RAA, and concluding that "the sums due plaintiffs remain plan assets subject to UNUM's fiduciary obligations until actual payment." *Id.* at 26.

Plaintiffs argue that *Mogel* should be broadly interpreted as standing for the categorical proposition that an insurer can *never* invest the funds backing an RAA, regardless of the terms of the plan, because "retained assets" are, by definition, "plan assets." They point to a few recent district court decisions that arguably support such an interpretation of *Mogel*. *See, e.g.*, *Otte v. Life Ins. Co. of N. Am.*, No. 09-CV-11537-RGS, 2011 U.S. Dist. LEXIS 62489, at *12-16 (D. Mass. June 10, 2011); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, No. 10-4919, 2011 U.S. Dist. LEXIS 36352, at *43-46 (E.D. Pa. Apr. 1, 2011); *Vander Luitgaren v. Sun Life Assurance Co. of Canada*, No. 1:09-cv-11410-NG, 2010 U.S. Dist. LEXIS 127620, at *3-4 (D. Mass. Nov. 18, 2010).

13

We agree with the DOL and the district court that *Mogel* is better understood as predicated on the fact, not present here, that the insurer failed to abide by plan terms requiring it to distribute benefits in lump sums. *See Mogel*, 547 F.3d at 26 (holding that "UNUM cannot be said to have completed its fiduciary functions *under the plan* when it set up the [RAAs]" because "delivery of the checkbook did not constitute a 'lump sum payment' *called for by the policies*" (emphasis added)). Indeed, much of the First Circuit's opinion is devoted to establishing that payment by RAA is not, in fact, the same thing as payment by lump sum. *See id.* But while that distinction was dispositive in *Mogel* because the plans obligated UNUM to distribute benefits by lump sum payment, it is not determinative here, where the SPDs expressly provide that MetLife will distribute benefits by the establishment of a TCA.

In sum, we conclude that in this case, MetLife discharged its ERISA fiduciary duties by establishing Plaintiffs' TCAs in accordance with the Kodak and GM Plans, and did not retain plan assets by holding the funds backing the TCAs. Accordingly, the complaint fails to state a claim under §§ 1104(a) or 1106(b)(1). At the end of the day, Faber and the Estate received all of the benefits promised to them by the Plans, in the form provided for by the Plans. *See Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 624 (2d Cir. 2006) (Sotomayor, J.) ("The aim of ERISA is to make the plaintiffs whole, but not to give them a windfall." (internal quotation marks omitted)); *Bennett v. CONRAIL Matched Sav. Plan Admin. Comm.*, 168 F.3d 671, 677 (3d Cir. 1999) ("ERISA does no more than protect the benefits which are due to an employee under a

plan.").[4] We have considered Plaintiffs' remaining contentions on appeal and find them to be without merit.[5]

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[4] We note that in the course of correctly dismissing Plaintiffs' § 1106 claim, the district court erred in suggesting that the claim required an allegation of injury to the Plans. *See Faber*, 2009 U.S. Dist. LEXIS 98775, at \*28. As we have previously recognized, injury to the plan is not an element of a prohibited transaction claim under § 1106(b)(1), and MetLife does not argue otherwise on appeal. *See LaScala v. Scrufari*, 479 F.3d 213, 221 (2d Cir. 2007) ("The fact that the [pension funds] may not have suffered any loss as a result of [the plan manager's self-dealing] may bear on the question of damages, but has no bearing on whether [he] breached his fiduciary duties in the first place."); *see also Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (purpose of § 1106 is to categorically bar transactions "likely" to injure the plan). The error is of no moment, as Plaintiffs' prohibited transaction claim fails for the reasons stated herein.

[5] We reject Plaintiffs' argument, raised for the first time in a post-argument letter brief, that we should remand this case to the district court so that the Kodak and GM insurance policies and other plan documents may be added to the record. Plaintiffs have waived this argument. They never alleged in their complaint, nor argued in their initial or reply briefs on appeal, that the SPDs misrepresented or are inconsistent with the underlying Plans. In fact, they relied upon the SPDs' description of how TCAs are utilized to distribute death benefits in arguing that this form of payment constituted a breach of MetLife's ERISA fiduciary duties. Any claim that the form of payment described in the SPDs is inconsistent with the form of payment called for by the GM and Kodak Plans was not before either the district court or this Court.

15