18-2043-cv
*Dantas v. Citibank N.A.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 8th day of July, two thousand nineteen.

PRESENT:   JON O. NEWMAN,
　　　　　　PETER W. HALL,
　　　　　　DENNY CHIN,

-----------------------------------------------------------------------
DANIEL VALENTE DANTAS, DORIO FERMAN, OPPORTUNITY FUND, OPPORTUNITY GESTAO DE INVESTIMENTOS E RECURSOS LTDA, OPPORTUNITY DISTRIBUIDORA DE TITULOS E VALORES MOBILIARIOS LTDA, OPPORTUNITY HDF PARTICIPACOES S.A., FKA BANCO OPPORTUNITY S.A., OPPORTUNITY ASSET MANAGEMENT INC., OPPORTUNITY ASSET MANAGEMENT LTDA., OPPORTUNITY ASSET ADMINISTRADORA DE RECURSOS DE TERCEIROS LTDA, OPPORTUNITY GESTORA DE RECURSOS LTDA., OPPORTUNITY LOGICA RIO CONSULTORIA E PARTICIPACOES LTDA., FKA OPPORTUNITY LOGICA RIO GESTORA DE RECURSOS LTDA., OPPORTUNITY EQUITY PARTNERS ADMINISTRADORA DE RECURSOS LTDA., OPP I FUNDO DE INVESTIMENTO EM ACOES INVESTIMENTO NO EXTERIOR, LUXOR FUNDO DE INVESTIMENTO MULTIMERCADO, INTERNATIONAL MARKET INVESTMENTS N.V.,

*Plaintiffs - Appellants,*

v.                                                                          No. 18-2043-cv

1

CITIGROUP, INC., BANCO CITIBANK S/A,
INTERNATIONAL EQUITY INVESTMENTS, INC.,
CITIGROUP VENTURE CAPITAL INTERNATIONAL
BRAZIL, L.P., CITIGROUP VENTURE CAPITAL
INTERNATIONAL BRAZIL, LLC, CITIBANK N.A.,

*Defendants - Appellees.*

------------------------------------------------------------------------

FOR APPELLANTS:           PHILIP C. KOROLOGOS (Eric J. Brenner, *on the brief*), Boies Schiller Flexner LLP, New York, NY.

FOR APPELLEES:            CARMINE D. BOCCUZZI, JR. (Ryan S. Redway, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Stein, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court is **AFFIRMED**.

Daniel Valente Dantas, Dorio Ferman, and various entities in the Opportunity family of companies (collectively, "Appellants") appeal from a judgment of the United States District Court for the Southern District of New York (Stein, *J.*) entered on June 18, 2018, dismissing the complaint and denying the motion to amend the complaint. Appellants brought this action against Citibank and some of its affiliates and subsidiaries (collectively, "Citibank") claiming that a 2008 settlement agreement between the parties was obtained through duress by Citibank and that Appellants are therefore entitled to damages. Dantas additionally sued Citibank for malicious prosecution and conspiracy to engage in malicious prosecution, alleging that Citibank triggered his unfounded prosecution for financial crimes in Brazil. The District Court dismissed the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

2

We assume the parties' familiarity with the facts, record of prior proceedings, and arguments on appeal, which we reference only as necessary to explain our decision to affirm.

I.

The following facts are drawn from the allegations in the complaint, which we assume to be true. *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). In the 1990s, Dantas, the founder of Opportunity, established a joint venture aimed at obtaining control positions in Brazil's infrastructure sector. Citibank, a group of Brazilian government pension funds, and others invested in the joint venture. The pension fund investors eventually turned against Dantas and Opportunity, working with competitors in the telecommunications market and corrupt Brazilian government officials in the PT Party to discredit Opportunity and Dantas.

When the Brazilian government, which was fearful that Dantas would expose its illegal practices, brought false criminal charges against Dantas in 2004, Citibank switched sides to avoid scandal. Citibank sued Opportunity and Dantas in the Southern District of New York, alleging breach of fiduciary duties. *See* Complaint, *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, No. 05-cv-2745 (S.D.N.Y.) ("*IEII* litigation"). Opportunity counterclaimed, alleging, *inter alia*, that Citibank breached *its* fiduciary duties. Opportunity also made allegations about the corruption of President Luiz Inácio Lula da Silva's regime, deepening the PT Party's hostility towards Opportunity and Dantas. Meanwhile, in Brazil, Citibank worked with PT Party members, the pension funds, and their allies at Brasil Telecom to intensify the media campaign against Dantas, Ferman, and Opportunity. Seeking to "keep up the pressure" and "influence the course of events in the judiciary," Citigroup's "Task Force" arranged for the payment of journalists to write "hundreds of

3

negative articles" about Opportunity such as false reports of mismanagement at Brasil Telecom during the period Opportunity controlled the company. C. App. 37–38. Further, Citigroup and its governmental allies manipulated a Brazilian congressional report so that it recommended research on a possible indictment of Dantas and falsely accused Dantas of improperly paying large sums to influence government officials in the Mensalão corruption scandal.

In 2007, Opportunity further angered the PT Party by standing in the way of a merger between two telecommunications companies that would benefit a major PT contributor. For various reasons, the merger would not go through until Opportunity agreed to give up its claims against Citibank. Dantas received a number of implicit and explicit threats from PT and government representatives, including "that he should not make himself an obstacle to the will of the government," "that there is no way to withstand the force of the state," and that "representatives of the regime would be willing to imprison him based on manufactured evidence." *Id.* at 54–55, 64–65. He also received threats from Citibank's lead negotiator in the merger transaction who warned Opportunity "that the government would take charge and force Opportunity to grant Citibank a release" and that Dantas "could hide but not escape." *Id.* at 60, 62. Citibank's strategy was to "mak[e] additional concessions from Opportunity the price for closing a transaction that the PT Party and its benefactors desperately wanted" and thereby "gain[] the full coercive power of the regime to force" the releases. *Id.* at 63. Under the escalating pressure, in April 2008, Dantas, Ferman, and Opportunity signed a Comprehensive Settlement and Release Agreement ("Settlement Agreement") with Citibank, which included a mutual release of claims and put an end to the *IEII* litigation. *Id.* at 69.

4

Factions in the PT Party nevertheless viewed Dantas and his colleagues as a "continuing threat" because "they knew too much about the regime's corrupt activities." *Id.* at 71. A few months after the Settlement Agreement was signed, Dantas was arrested by the Brazilian authorities based on false accusations of bribery, financial crimes, and money laundering. The charges of financial wrongdoing were based in part on the false report manufactured by Citibank and its allies regarding Dantas's involvement in the Mensalão scandal. After Dantas, Ferman, and their colleagues were released from custody thanks to the Brazilian Supreme Court, "Citibank's co-conspirators" provided fresh information about alleged wrongdoing by Opportunity. *Id.* at 78. The criminal charges were ultimately dismissed in full.

## II.

"We review *de novo* a grant of a motion to dismiss pursuant to Rule 12(b)(6), accepting the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 898 F.3d 232, 236 (2d Cir. 2018) (internal quotation marks omitted). We also review *de novo* a district court's interpretation of a contract. *Lee v. BSB Greenwich Mortgage Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir. 2001).

## III.

Applying New York law pursuant to the Settlement Agreement's choice-of-law provision, the District Court determined that Appellants released all of their claims in the Settlement Agreement and that the Settlement Agreement was enforceable regardless of Citibank's conduct because Appellants ratified it. We address the duress and malicious prosecution claims in turn.

5

**A. Duress**

The complaint asserts two duress claims: one under Brazilian law and one, in the alternative, under New York law.[1] We assume without deciding that New York law recognizes duress as a cause of action sounding in tort.[2]

Appellants argue, first, that the release provision is unenforceable as to their duress claims because "a release cannot prevent challenges to the circumstances under which it was obtained." Appellant Br. 32. Appellants' challenge to the enforceability of the release fails because Appellants have ratified the Settlement Agreement. Under New York law, because contracts executed under duress are voidable rather than void, "a plaintiff cannot claim that he or she was compelled to execute an agreement under duress while simultaneously accepting the benefits of the agreement." *Allen v. Riese Org., Inc.*, 106 A.D.3d 514, 517 (1st Dep't 2013); *accord VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122–23 (2d Cir. 2001). "[W]hen a party accepts the benefits of a contract and fails to act promptly to repudiate it," the party ratifies the contract. *Allen*, 106 A.D.3d at 517; *accord Nelson v. Lattner Enters. of N.Y.*, 108 A.D.3d 970, 972 (3d Dep't 2013). Appellants effectively concede that they have ratified

---

[1] Because Appellants challenge neither the District Court's application of New York law nor the validity of the Settlement Agreement's choice-of-law provision, we apply New York law. *See City of Syracuse v. Onondaga County*, 464 F.3d 297, 308 (2d Cir. 2006) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal." (internal quotation marks omitted)); C. App. 123 (Settlement Agreement § 7.10). Appellants concede that the choice of law does not affect the outcome of this appeal.

[2] New York law appears to be unsettled with respect to whether duress may be asserted not only as an equitable defense but also as a tort claim. *Compare Bank Leumi Trust Co. of N.Y. v. D'Evori Int'l, Inc.*, 163 A.D.2d 26, 31 (1st Dep't 1990) ("[W]e do not believe that the doctrine of economic duress, which is traditionally used as a defense to an action, has any place in a cause of action seeking money damages."), *and Nice v. Combustion Eng'g, Inc.*, 193 A.D.2d 1088, 1089 (4th Dep't 1993) ("There is no substantive cause of action for duress . . ."), *with Ressis v. Mactye*, 108 A.D.2d 960, 961 (3d Dep't 1985) (treating duress as a "cause[] of action known to law"), *and Ippisch v. Moricz-Smith*, 1 Misc. 2d 120, 124 (Sup. Ct. 1955) (same).

6

the Settlement Agreement, insisting that they have a "right to keep any benefits and the certainty of the settlement while pursuing additional damages." *See* Appellant Br. 3.

Appellants take the position that ratification does not apply to their duress claims because they seek damages rather than rescission. Appellants press an analogy to the fraud context, where "a plaintiff has a choice of remedies. On the one hand, such a plaintiff can opt to ratify the settlement and sue for damages. Or the plaintiff can sue for rescission." Appellant Br. 44. Appellants' analogy misses the mark. The fraudulent inducement cases cited by Appellants stand for the proposition that a party who has been fraudulently induced to settle a claim may bring an action to recover fraud damages without repudiating the settlement. *See, e.g.*, *Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir. 1994). The fraud claims in the cases on which Appellants rely were independent of the underlying wrong that was the subject of the fraudulently induced settlement and were thus outside the scope of any release. *See, e.g.*, *Slotkin v. Citizens Cas. Co. of N.Y.*, 614 F.2d 301, 312 (2d Cir. 1979). New York law does not permit a plaintiff to circumvent a release agreement by using a released fraud claim to attack the validity of the release and then assert that very fraud claim for damages. *See Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011) (explaining that "a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release" and noting that "[w]ere this not the case, no party could ever settle a fraud claim with any finality"). More to the point, there is a crucial difference between a claim for fraudulent inducement and a claim for duress. A fraudulent inducement claim, unlike a duress claim, is typically unforeseen at the time of entering an agreement. Here, by contrast, Appellants were well aware of the events giving rise to the instant duress claim at the time

7

they entered the Settlement Agreement. Indeed, Appellants would not have a duress claim but for the subjective experience of feeling pressure as a result of the pre-Settlement events detailed in the complaint. Appellants' analogy to the fraudulent inducement context thus fails to support their argument that the release agreement is unenforceable as to the duress claims. Because Appellants have ratified the Settlement Agreement and insist on their right to retain its benefits, the release is enforceable. *See Allen*, 106 A.D.3d at 517.[3]

The question, then, is whether the duress claims are released under the terms of the Settlement Agreement. Section 2.1(b) of the Settlement Agreement releases "any Cause of Action for any acts or omissions prior to the date of this Agreement, that arises from, is based on or relates to" several listed items, including the facts and circumstances at issue in the *IEII* litigation. C. App. 110 (Settlement Agreement § 2.1(b)). A carve-out provision entitled "Claims Not Included" provides, however, that the release "shall not be interpreted to include, the release of any Cause of Action . . . arising out of or for breach of this Agreement." *Id.* at 111 (Settlement Agreement § 2.1(c)(ii)).

Appellants do not challenge the District Court's conclusion that the duress claims fall within Section 2.1(b). Appellants contend that the duress claims fall within the carve-out provision because, contrary to the District Court's conclusion, the duress claims "arise out

---

[3] Appellants also argue that that the District Court improperly found ratification by delay because Appellants alleged that the duress abated enough to allow them to bring this action only a few weeks prior to filing the complaint. We need not decide whether Appellants' delay was reasonable because Appellants do not repudiate the Settlement Agreement even now, insisting that they need not do so. *See* Appellant Br. 47. A party seeking to challenge the validity of an agreement based on duress has an obligation to repudiate the agreement once the duress has ceased. *See Sosnoff v. Carter*, 165 A.D.2d 486, 492 (1st Dep't 1991) (Although a party seeking to "disaffirm a contract made under duress must act promptly to repudiate it," a party has "no obligation to repudiate until the duress has ceased.").

8

of" the Settlement Agreement. We disagree. "To 'arise out of' means to originate from a specified source, and generally indicates a causal connection." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) (internal quotation marks and citations omitted). We have declined to interpret "the words 'arise out of' as encompassing all claims that have some possible relationship with [a] contract, including claims that may only 'relate to,' be 'associated with,' or 'arise in connection with' the contract." *Id.* That narrow interpretation is appropriate here. As the District Court reasoned, under the canon against surplusage, "arising out of" cannot be interpreted so broadly as to be synonymous with "based on" or "relates to" because Section 2.1(b) of the Settlement Agreement releases certain claims "that arise[] from, [are] based on or relate[] to" certain listed items. C. App. 110. To be sure, by the same principle, "arising out of" cannot be interpreted so narrowly as to cover only claims "for breach of" the Settlement Agreement.[4] The District Court appropriately threaded this needle by interpreting "arising out of" to cover both breach of contract actions and other actions that require a court to interpret a contractual provision, such as a declaratory judgment action. Sp. App. 11 n.8. Here, the duress claims do not concern the parties' obligations under the Settlement Agreement and do not turn on interpretation of the agreement's terms. Further, the duress claims cannot be said to "originate from" the Settlement Agreement, *Phillips*, 494 F.3d at 389, because they are based on events that predated its execution. Thus, although the duress claims "relate to" and "arise in connection with" the Settlement Agreement, they do not "arise out of" the Settlement Agreement.

---

[4] We therefore do not predict that the New York Court of Appeals would in this context adopt as state law the First Department's view that whether an action "arises out of" an agreement is "determined by whether the litigation is based upon a breach of the terms" of that agreement. *Jerulee Co. v. Sanchez*, 43 A.D.3d 328, 329 (1st Dep't 2007).

9

Appellants' claim that the duress continued up to and included the moment of execution of the Settlement Agreement does not mandate a contrary conclusion. Although Appellants assert they felt the effects of Citibank's allegedly coercive conduct at the time of executing the Settlement Agreement, all of the alleged wrongful conduct ostensibly giving rise to the duress claims had occurred before they entered the agreement.

Nor are we persuaded by Appellants' argument that the duress claims "arise out of" the Settlement Agreement because "it is the very validity of the Settlement that the Duress Claims put at issue." Appellant Br. 25. Appellants argue that the Settlement Agreement "does not take away a party's right to insist that the terms of the Settlement itself are enforceable." *Id.* Appellants are correct about that. Indeed, as Appellants recognize, the validity of the release agreement would be subject to attack on duress grounds *regardless* of any carve-out for claims "arising out of" the agreement. *See id.* at 26; *Centro Empresarial*, 952 N.E.2d at 1000 (stating that a release may be invalidated for any of "the traditional bases for setting aside written agreements," including duress). That the carve-out is unnecessary to asserting a duress challenge undermines any inference that the parties intended the carve-out to cover such a challenge. The issue is not whether the release agreement precludes the assertion of a duress *defense* but whether it precludes the assertion of duress *as a tortious cause of action*. Because Appellants' duress claims fall within the release provision and do not fall within the carve-out provision, those claims are released and were properly dismissed pursuant to Rule 12(b)(6).

## B. Malicious Prosecution

Appellants argue that the malicious prosecution claims are not released because they accrued after the date of the Settlement Agreement. Regardless of Appellants' accrual

argument, dismissal was proper under Fed. R. Civ. P. 12(b)(6) because the complaint fails to state a claim for malicious prosecution. To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face" and provide "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted). To state a claim for the tort of malicious prosecution under New York State law, a plaintiff must show, among other elements, "the initiation or continuation of a criminal proceeding against plaintiff." *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997); *accord Gill v. City of New York*, 146 A.D.3d 939, 941 (2d Dep't 2017).

> In order for a civilian defendant to be considered to have initiated the criminal proceeding, it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act. The defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition.

*Lupski v. County of Nassau*, 32 A.D.3d 997, 998 (2d Dep't 2006) (internal quotation marks and citations omitted). A civilian defendant who "merely furnishes information to law enforcement authorities who are then free to exercise their own independent judgment" is not liable for malicious prosecution. *Id.*

The complaint contains few allegations relevant to establishing that Citibank initiated the Brazilian government's arrest and prosecution of Dantas. The most concrete allegation linking the criminal proceeding to Citibank is the allegation that Citibank and its governmental allies manipulated the Brazilian congressional report so that it falsely accused Dantas of corrupting officials and recommended further research on a possible indictment of Dantas. That false report, along with wrongful conduct by the PT regime and others in

11

the telecommunications industry as well as various sources of false evidence unrelated to the Mensalão report, culminated in the arrests of and false charges against Dantas and his colleagues.

The facts alleged fail to show that Citibank played the kind of "active role" in the prosecution of Dantas that is required to support a malicious prosecution claim. *Id.* Citibank arguably did not even "furnish[] information to law enforcement authorities" when it manipulated the report given to the congressional committee of inquiry. *Id.* Opportunity and Dantas admitted in the *IEII* litigation that the congressional committee "does not even have the power to recommend an indictment in Brazil. That role is reserved for the Public Prosecutor pursuant to express Constitutional rules. The [committee] may only recommend that the Public Prosecutor investigate whether to recommend such an indictment." J. App. 439.[5] The facts alleged certainly do not establish that Citibank induced any law enforcement officer to act "to the point where the officer [was] not acting of his own volition." *Lupski*, 32 A.D.3d at 998. The mere fact that Citibank provided false information to the government is insufficient to conclude that Citibank initiated the prosecution, given that various other players, concerns, and sources of evidence contributed to the government's decision to prosecute Dantas. *See Rothstein v. Carriere*, 373 F.3d 275, 294 (2d Cir. 2004). Because Citibank did not initiate a criminal proceeding against Dantas, Dantas fails to state a claim for malicious prosecution.[6] In any event, all of the actions Citibank allegedly took to

---

[5] The complaint includes other allegations of information being provided to law enforcement, but not by Citibank. *See, e.g.*, C. App. 78 (alleging that "Citibank's co-conspirators," including Brasil Telecom's lawyers, provided information to the police about alleged wrongdoing at Brasil Telecom when it was under Opportunity's control).

[6] Because Dantas fails to state a claim for malicious prosecution, he also fails to state a claim for conspiracy to engage in malicious prosecution. *See Thyroff v. Nationwide Mut. Ins. Co.*, No. 05-CV-

cause Dantas to be prosecuted occurred before the Settlement Agreement was executed. Dantas's malicious prosecution claims against Citibank therefore fall within the scope of the release. C. App. 110 (Settlement Agreement § 2.1(b) (releasing "any Cause of Action for any acts . . . prior to the date of this Agreement . . .")).

<div align="center">IV.</div>

We have considered all Appellants' remaining arguments and have found in them no basis for reversal. Accordingly, we **AFFIRM** the judgment of the District Court.

<div style="margin-left: 40%;">FOR THE COURT:<br>Catherine O'Hagan Wolfe, Clerk of Court</div>

---

6607T, 2006 WL 2827082, at *2 (W.D.N.Y 2006) ("To state a cause of action for conspiracy to engage in malicious prosecution, the plaintiffs must establish the underlying elements of both a conspiracy and a malicious prosecution."); *Cunningham v. Hagedorn*, 72 A.D.2d 702, 704 (1st Dep't 1979).

<div align="center">13</div>